App. 1

## United States Court of Appeals
## For the First Circuit

————————————

No. 18-1560

DR. JEFFREY ISAACS,

Plaintiff, Appellant,

v.

TRUSTEES OF DARTMOUTH COLLEGE;
NH BOARD OF MEDICINE;
DARTMOUTH HITCHCOCK MEDICAL CENTER,

Defendants, Appellees.

JEFFREY S. CAHILL; PENNY TAYLOR,

Defendants.

————————————

Before

Lynch, Stahl, and Barron,
<u>Circuit Judges</u>.

————————————

## JUDGMENT

Entered: January 3, 2019

We have carefully reviewed the record in this case, including the briefs of the parties. As to the issues saved on appeal, we find no error in the district court's orders dismissing the amended complaint and denying leave to file a second amended complaint.

For largely the reasons given by the district court, without adopting all of the several reasons given in its

App. 2

orders dated July 12, 2017, October 24, 2017, February 5, 2018, and May 15, 2018, the judgment of the district court is affirmed.

By the Court:

Maria R. Hamilton, Clerk

cc:  Mark L. Josephs, Pierre A. Chabot,
     Elizabeth E. Ewing, Seth Michael Zoracki,
     William D. Pandolph

App. 3

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW HAMPSHIRE

Dr. Jeffrey Isaacs

    v.

Trustees of Dartmouth
College, et al.

Case No. 17-cv-00040-LM

## JUDGMENT

In accordance with the following, judgment is hereby entered:

1.   Order by Judge Landya B. McCafferty dated July 12, 2017;

2.   Order by Judge Landya B. McCafferty dated October 24, 2017;

3.   Order by Judge Landya B. McCafferty dated February 5, 2018; and

4.   Order by Judge Landya B. McCafferty dated May 15, 2018.

By the Court:

/s/ Daniel J. Lynch
     Daniel J. Lynch
     Clerk of Court

Date:  May 15, 2018

cc:   Counsel of Record

App. 4

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

<u>Dr. Jeffrey Isaacs</u>

    v.

<u>Trustees of Dartmouth
College, NH Board of
Medicine, and Dartmouth-
Hitchcock Medical Center</u>

Civil No. 17-cv-040-LM
Opinion No. 2018 DNH 096

## **ORDER**

In an order dated February 5, 2018, the court largely denied plaintiff's motion for leave to amend his First Amended Complaint ("FAC"). However, the court gave him the opportunity to keep his case alive by showing cause why Count I of his proposed Second Amended Complaint ("SAC") is not barred by N.H. Rev. Stat. Ann. ("RSA") § 329:17, IX. Before the court are: (1) plaintiff's motion, pursuant to Rule 60 of the Federal Rules of Civil Procedure, for relief from the court's ruling that it would be futile to amend his FAC by adding the federal Rehabilitation Act retaliation claim he asserted in Count VI of his SAC; and (2) plaintiff's show cause briefing. Both pleadings are duly opposed. For the reasons that follow, plaintiff's motion for Rule 60 relief is denied, and his show cause briefing is insufficient to save Count I of his SAC. Accordingly, plaintiff's case is dismissed in its entirety.

App. 5

## I.   Motion for Rule 60 Relief

Document no. 76 bears the caption "Motion Requesting Relief from Judgment Order on Motion to Amend. Document No. 70." In it, plaintiff asks the court to reverse its determination that it would be futile to amend his FAC by adding Count VI of his proposed SAC. Both the Trustees of Dartmouth College ("Trustees") and Dartmouth-Hitchcock Medical Center ("DHMC") object.

### A.   The Legal Standard

Plaintiff seeks relief under Rule 60(b)(1), which provides that "[o]n motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for . . . mistake, inadvertence, surprise, or excusable neglect." He does not, however, indicate which of the four prongs of Rule 60(b)(1) he is invoking. Be that as it may, regardless of the specific part of Rule 60(b)(1) that plaintiff is relying on, the following principles govern the court's consideration of his motion:

> Federal Rule of Civil Procedure 60(b) relieves parties from final judgments only under exceptional circumstances. *See Dávila-Álvarez v. Escuela de Medicina Universidad Cent. del Caribe*, 257 F.3d 58, 63-64 (1st Cir. 2001) (citing *Lepore v. Vidockler*, 792 F.2d 272, 274 (1st Cir. 1986)). A party seeking Rule 60(b) relief must show, at a bare minimum, "that his motion is timely; that exceptional circumstances exist, favoring extraordinary

App. 6

> relief; that if the judgment is set aside, he has the right stuff to mount a potentially meritorious claim or defense; and that no unfair prejudice will accrue to the opposing parties should the motion be granted." *Karak v. Bursaw Oil Corp.*, 288 F.3d 15, 19 (1st Cir. 2002) (internal citations omitted).

*Skrabec v. Town of N. Attleboro*, 878 F.3d 5, 9 (1st Cir. 2017); *see also Karak*, 288 F.3d at 19 ("relief under Rule 60(b) is extraordinary in nature and . . . motions invoking that rule should be granted sparingly") (citing *Teamsters, Chauffeurs, Warehousemen & Helpers Union, Local No. 59 v. Superline Transp. Co.*, 953 F.2d 17, 19-20 (1st Cir. 1992); *Lepore*, 792 F.2d at 274.

### B.  Discussion

In Count VI of his proposed SAC, plaintiff asserted that: (1) "[i]n March of 2013 [he] effectively filed a Rehabilitation Act claim with OCR," doc. no. 51-1 ¶ 115;[1] and (2) in retaliation for filing that complaint, DHMC declined to interview him when he applied for residencies in 2013, 2014, 2015, 2016, and 2017, *see id.* ¶¶ 118-120. The court declined to give plaintiff leave to amend his FAC to add Count VI of his SAC for two reasons: (1) his failure to adequately allege the first element of a Rehabilitation Act retaliation claim, *i.e.*, protected conduct, *see* doc. no. 70, at 38-40; and (2) his failure to adequately allege the third element of such a claim,

---

[1] OCR is the Office of Civil Rights in the United States Department of Education. *See* doc. no. 76-1, at 1.

App. 7

*i.e.*, a causal connection between protected conduct and an adverse action, *see id.* at 40-42.[2] With respect to the third element, the court explained that "for an . . . action to be retaliatory, the person taking that action must have known about the . . . protected conduct at the time he or she took the allegedly retaliatory action." *Id.* at 40-41. After establishing that rule of law, the court went on to point out that plaintiff's complaint did not allege that anyone who denied him an interview for a residency ever knew about his OCR complaint.

In the motion now before the court, plaintiff attempts to cure both of the deficiencies that led the court to deny him leave to amend his FAC to add Count VI. He does so by attaching to his motion a letter he received from an OCR attorney in October of 2014 which communicated OCR's decision to dismiss his complaint without investigation because it was untimely. According to plaintiff, "the facts that appear on the face of the attached [letter show] [t]hat he made a Rehabilitation Act Claim and that the Defendants were made aware of that claim when it was served upon them." Doc. no. 76 ¶ 10. However, plaintiff says

_____

[2] In *Lebrón v. Puerto Rico*, the court of appeals explained that [t]o establish a prima facie claim for retaliation under . . . the Rehabilitation Act, [plaintiff] would have to show that [he] "engaged in protected conduct," [was] "subjected to an adverse action by the defendant," and [that] "there was a causal connection between the protected conduct and the adverse action."

770 F.3d 25, 31 (1st Cir. 2014) (quoting *D.B. ex rel. Elizabeth B. v. Esposito*, 675 F.3d 26, 41 (1st Cir. 2012)) (footnote removed).

nothing about why he did not include the facts that appear on the face of the October 2014 OCR letter in Count VI of the proposed SAC he filed in November of 2017. That is fatal to his request for Rule 60(b) relief.

As the court has noted, entitlement to relief under Rule 60(b) requires a showing of "exceptional circumstances." *Skrabec*, 878 F.3d at 9. To demonstrate that the circumstances that caused him not to include facts from the OCR letter in his proposed SAC were exceptional, plaintiff must at least say what those circumstances were. *See United States v. $29,373.00 in U.S. Currency*, 86 F.Supp.3d 95, 99-100 (D.P.R. 2015) ("Claimants do not elaborate on the circumstances of their mistaken belief that they had filed a claim. Without more, the Court cannot evaluate whether the mistake is justified, excusable, or honest."); 11 Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2858 (3d ed. 2012) (explaining that a party seeking Rule 60(b)(1) relief "must make some showing justifying the failure to avoid the mistake or inadvertence"); *Cashner v. Freedom Stores, Inc.*, 98 F.3d 572, 576 (10th Cir. 1996). In other words, "[s]imply alleging the fact of a mistaken belief does not suffice to show an 'exceptional circumstance' warranting Rule 60(b) relief," *$29,373.00 in U.S. Currency*, 86 F.Supp.3d at 100. Here, plaintiff merely attaches the OCR letter to his Rule 60(b) motion. He does not even go so far as to allege mistake, inadvertence, surprise, or excusable neglect, much less identify any circumstances that would allow the court to conclude that his failure to allege facts from the OCR letter in his SAC

App. 9

was a result of a mistake, inadvertence, surprise, or excusable neglect that is justifiable. Thus, he has failed, by a wide margin, to make a showing that would entitle him to Rule 60(b)(1) relief. That alone warrants denial of plaintiff's Rule 60(b) motion.

However, even if some extraordinary circumstance did prevent plaintiff from alleging facts drawn from the October 2014 OCR letter until now, he has not shown "that if the judgment is set aside, he has the right stuff to mount a potentially meritorious claim." *Skrabec*, 878 F.3d at 9. In this context, the "right stuff" is an "underlying claim[ ] [that has] a reasonable chance of success on the merits." *Gonalez Rucci v. U.S. INS*, 405 F.3d 45, 48 (1st Cir. 2005) (citing *Caisse v. DuBois*, 346 F.3d 213, 215-16 (1st Cir. 2003)); *Beshear v. Weinzapfel*, 474 F.2d 127, 132 (7th Cir. 1973) (the movant, if a plaintiff, "must show *facts* which, if established, might reasonably be said to be a basis for recovery") (emphasis supplied); *Gomes v. Williams*, 420 F.2d 1364, 1366 (10th Cir. 1970) (similar); *Lepkowski v. U.S. Dep't of Treasury*, 804 F.2d 1310, 1314 n.4 (D.C. Cir. 1986) (suggesting that the movant, a plaintiff, had an obligation to "set forth facts" sufficient to raise the prospect of overcoming an identified defense). Plaintiff's problem is that, notwithstanding his argument to the contrary, the facts in the OCR letter do not establish that any defendant knew about his OCR complaint, and without an allegation of knowledge of the OCR complaint on the part of a defendant who took adverse action against him, plaintiff cannot state a Rehabilitation Act retaliation claim that has a reasonable

App. 10

chance of success on the merits. *See Lebrón*, 770 F.3d at 31; *Taite v. Shineski*, No. 08-cv-258-SM, 2010 WL 745160, at *19 (D.N.H. Mar. 1, 2010).

The OCR letter describes Dr. Isaacs's complaint as having been "filed against Dartmouth College (College) and Dartmouth-Hitchcock Medical Center." Doc. no. 76-1, at 1. But, the letter: (1) says nothing about Dr. Isaacs's complaint having been served, by anyone, on either Dartmouth College or DHMC; (2) makes no suggestion that OCR dismissed Dr. Isaacs's complaint in response to arguments advanced by either Dartmouth College or DHMC after they had been served with it; and (3) gives no indication, such as a listing of "cc:" recipients, that the letter was sent to either Dartmouth College or DHMC. Thus, the OCR letter does not support an allegation that any person who reviewed Dr. Isaacs's residency applications had any knowledge of his OCR complaint. For that reason, the letter does not remedy the deficiency the court previously identified in plaintiff's allegation of the third element of a Rehabilitation Act retaliation claim. Plaintiff argues that the OCR letter establishes that DHMC and the Trustees were made aware of his Rehabilitation Act claim "when it was served upon them," doc. no. 76 ¶ 10, but the letter does not indicate that any Dartmouth entity was ever served with Dr. Isaacs's OCR complaint.

Apart from attaching the OCR letter to his motion, plaintiff supports his argument on the causation element with little more than his own incredulity. For example, he says: "[g]iven that the original claim was brought against them, there is no plausible way that

App. 11

the Defendants were unaware of it." Doc. no. 76 ¶ 5; *see also id.* ¶¶ 7 & 8 (similar expressions of disbelief). Plaintiff's incredulity is no substitute for an adequate factual allegation. *Cf. Barchock v. CVS Health Corp.*, 886 F.3d 43, 48 (1st Cir. 2018) (explaining that for purposes of Rule 12(b)(6), "[w]ell-pleaded facts must be 'non-conclusory' and 'non-speculative'") (quoting *Schatz v. Rep. State L'ship Comm.*, 669 F.3d 50, 55 (1st Cir. 2012)).[3]

In sum, the facts on the face of the OCR letter provide the court with an insufficient basis for reversing its previous ruling that it would be futile to amend plaintiff's FAC to add the Rehabilitation Act claim he asserted in Count VI of his SAC, because Count VI does not state a claim upon which relief can be granted. *See Glassman v. Computervision Corp.*, 90 F.3d 617, 623 (1st Cir. 1996) (explaining that "'[f]utility' means that the complaint, as amended, would fail to state a claim upon which relief could be granted" and that "[i]n reviewing for 'futility,' the district court applies the same standard of legal sufficiency as applies to a Rule 12(b)(6) motion") (citations omitted); *Barchock*, 886 F.3d at 48 ("To survive dismissal . . . , the complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its

---

[3] The court notes that the Trustees have offered a plausible explanation for their lack of knowledge of Dr. Isaacs's OCR complaint, pointing out: (1) OCR's decision not to investigate Dr. Isaacs's complaint because it was untimely; and (2) OCR's policy of not informing the target of a complaint that a complaint has been lodged against it until OCR decides to investigate the complaint. *See* doc. no. 78, at 5 n.1 (citing manual on OCR web site).

App. 12

face") (citations and internal quotation marks omitted); *Abraham v. Woods Hole Ocean Inst.*, 553 F.3d 114, 117 (1st Cir. 2009) (explaining that when proposed amended complaint "still fails to state a claim, the district court acts within its discretion in denying the motion to amend") (citations omitted)). Accordingly, plaintiff's Rule 60 motion is denied.

## II.  Show Cause Briefing

In document no. 70, in addition to ruling that it would be futile to amend plaintiff's FAC to add Count VI of his proposed SAC, the court also ordered plaintiff to show cause why the due process claim he asserts in Count I of his SAC, by means of 42 U.S.C. § 1983, is not barred by RSA 329:17, IX. While Count I does not appear to be barred by RSA 329:17, IX, it is barred by the doctrine of qualified immunity.

### A.  Background

Unless otherwise indicated, the facts recited below are drawn from plaintiff's SAC and previous orders in this case.

Isaacs attended the Keck School of Medicine ("Keck") at the University of Southern California ("USC") until, during his first year, "he was suspended and ultimately dismissed for harassing a classmate." *Isaacs v. Dartmouth-Hitchcock Med. Ctr.*, No. 12-CV-040-LM, 2014 WL 1572559, at *2 (D.N.H. Apr. 18, 2014). Dr. Isaacs then sued USC. His suit resulted in

App. 13

two settlement agreements. Plaintiff's allegations concerning the contents of those agreements are not stated with great clarity in his SAC. While plaintiff was obviously under no obligation to do so, he attached 18 exhibits to his original complaint, but did not attach either of the settlement agreements, even though they certainly would qualify as "documentation incorporated by reference in [a] complaint," *Sanders v. Phoenix Ins. Co.*, 843 F.3d 37, 42 (1st Cir. 2016) (quoting *Rivera-Díaz v. Humana Ins. of P.R., Inc.*, 748 F.3d 387, 388 (1st Cir. 2014)). Be that as it may, plaintiff's proposed SAC includes the following relevant factual allegations:

> Dr. Isaacs entered into two settlement agreements with Keck, one for dismissal of his action against its Deans, and another, dismissal against Keck as an institution. . . .

> The Institutional Settlement ordered Dr. Isaacs not to disclose his enrollment at Keck to others, and further, ordered Keck to cancel "all Administrative Charges," including Isaacs' expulsion from Keck.

Doc. no. 51-1 ¶¶ 36-37. Plaintiff further alleged that one of the two settlement agreements sealed his disciplinary records at Keck. *See id.* ¶ 39. He implies, but does not allege directly, that the agreement that sealed his disciplinary records was the so-called "Institutional Settlement," *id.* ¶¶ 38-39, and he further implies, but does not allege directly, that the Institutional Settlement was the second of the two agreements to be executed. However, in a document he attached to his

App. 14

original complaint, a September 3, 2013, e-mail he sent to Attorney Jeff Cahill, who was affiliated with the New Hampshire Board of Medicine ("Board"), Dr. Isaacs stated that it was the *first* settlement agreement rather than the second one that sealed his Keck disciplinary records. *See* doc. no. 3-18, at 1. In a document he attaches to his show-cause brief, a January 29, 2013, e-mail he sent to Penny Taylor, who was also affiliated with the Board, he said the same thing. *See* doc. no. 77-3, at 2 of 2. For reasons that will become apparent, it is more beneficial to plaintiff to construe his SAC as alleging that his Keck disciplinary records were sealed by the first settlement agreement rather than the second one, so the court will adopt that construction.

After Dr. Isaacs was dismissed from Keck, he earned an M.D. degree from the American University of the Caribbean, Netherlands Antilles. Then, he began a residency in general surgery at the University of Arizona ("UA"). He resigned after three weeks.

Next, Dr. Isaacs applied for a residency at DHMC. He did so through the Electronic Residency Application Service ("ERAS"), which is managed by the American Association of Medical Colleges ("AAMC"). In his ERAS application, Dr. Isaacs "omitted both his attendance at USC and his aborted residency at UA." *Isaacs*, 2014 WL 1572559, at *2. Based upon his ERAS application, Dr. Isaacs was accepted into the DHMC residency program in psychiatry.

App. 15

Dr. Isaacs began his DHMC residency in June of 2011. In an application for a training license that he submitted to the New Hampshire Board of Medicine, Dr. Isaacs omitted his attendance at Keck, and when asked whether he had "ever been reprimanded, sanctioned, restricted or disciplined in any activities involving medical education or practice," doc. no. 3-1, at 3 of 3, he responded in the negative, *see id.*

In March of 2012, Dr. Isaacs was dismissed from the DHMC residency program. His letter of dismissal cited both academic deficiency issues and "the omission of material information from [his] Electronic Residency Application Service (ERAS) Application [and] falsification of information provided to the New Hampshire Board of Medicine." Doc. no. 3-11, at 1. The letter continued:

> Specifically, your ERAS application lacked information regarding your prior residency training in Arizona as well as time served as a medical student at the University of Southern California. You also failed to divulge your dismissal from the medical school at USC in information provided to the New Hampshire Board of Medicine in support of a NH training license.

Doc. no. 3-11, at 1. As a result of Dr. Isaacs's dismissal from the DHMC residency program, his training license was "revoked as of the date of [his] termination [and] was canceled by operation of law." Doc. no. 7-1, at 8.

App. 16

After DHMC dismissed Dr. Isaacs, it notified the Board of its action, and further informed the Board that Dr. Isaacs "had allegedly omitted material facts from his Application for Training License for Residents and Graduate Fellows and the supplement filed along with the application." Doc. no. 7-1, at 1. "As a result of [that] information, the Board commenced an investigation to determine whether [Dr. Isaacs had] committed professional misconduct pursuant to RSA 329:17, VI and RSA 329:18." *Id.*

During the course of the Board's investigation, Dr. Isaacs corresponded with Atty. Cahill, who later served as the Board's counsel at the hearing that resulted from its investigation. In an e-mail dated September 3, 2013, Dr. Isaacs told Atty. Cahill:

> Attached is the first settlement with USC (settled 1 year prior to the second settlement I sent you last month), which sealed the USC disciplinary records. As you will see, the only consideration involved in this settlement contract was the sealing of disciplinary records.

Doc. no. 77-3, at 2 of 2. In October of 2013, the Board issued a Notice of Hearing, informing Dr. Isaacs that a hearing had been scheduled for February 5, 2014.

On January 29, 2014, Dr. Isaacs sent an e-mail to Penny Taylor, the Board's Administrator, that stated, in pertinent part:

> You have noticed a February 5th hearing, which I [h]ereby motion to stay, pending federal litigation in the Pennsylvania District

App. 17

> Court. The settlement agreement I entered
> into with USC clearly sealed my disciplinary
> records. A subsequent settlement agreement
> annulled all contracts and acquitted all con-
> troversies with USC. The AAMC and the
> NHES have both investigated this issue al-
> ready and agreed with me.

Doc. no. 3-18, at 1.[4]

The Board held its hearing, as scheduled, but Dr. Isaacs did not attend. After the hearing, the Board issued a Final Decision and Order, which was signed by Taylor.

In the decision, Taylor characterized the evidence the Board considered this way:

> The Board opened the hearing just after
> 1:00 p.m. on February 5, 2014. It first entered
> Exhibits A and B, Respondent's [*i.e.*, Dr.
> Isaacs's] e-mails dated January 29 and Febru-
> ary 5, as exhibits for Respondent. It also ac-
> cepted Exhibits 1-3 from hearing counsel.
> Exhibit 1 is Respondent's 2011 NH Applica-
> tion for Residency Training License; Exhibit 2
> is an excerpt of a March 1, 2007 court order in
> *Isaacs v. USC*; and Exhibit 3, the April 2008
> Confidential Agreement in *Isaacs v. USC*.
> These exhibits along with notice of witnesses
> to be presented were provided to Respondent
> on January 31, 2014.

---

[4] "NHES" appears to stand for "New Hampshire Department of Employment Security." *See Isaacs II*, 2014 WL 4186536, at *3.

App. 18

Doc. no. 7-1, at 5. It is clear that Exhibit 3 was the settlement agreement that concluded Dr. Isaacs's case against USC. The decision continues:

> In Exhibit A, Respondent alleges that the settlement agreement with USC [*i.e.*, the first agreement] "clearly sealed [his] disciplinary records, and a subsequent agreement annulled all contracts and acquitted all controversies with USC." It appears this is the reason Respondent contends he was not required to disclose the Keck School information on his training license application. A review, however, of Exhibit 3 [*i.e.*, the second agreement] indicates that it is only information related to the lawsuit, and the negotiation of the Settlement Agreement's terms and conditions that is confidential, along with the monetary settlement amount. There is no provision in Exhibit 3 "sealing the disciplinary records."

Doc. no. 7-1, at 6.

At the conclusion of the Board's order, Taylor noted that Dr. Isaacs's dismissal from the DHMC residency program terminated his medical license by operation of law. But she went on to announce the Board's determination that a reprimand was appropriate, as a sanction for the false statement and material omission in the license application that Dr. Isaacs submitted to the Board.

In an e-mail that bears no legible date, the AAMC notified Dr. Isaacs that it would "honor his request to keep the Keck information off of his [ERAS] report . . .

App. 19

and [would] provide a new draft preliminary report that only mention[ed] [his] time at Arizona." Doc. no. 3-12, at 1.

Count I of plaintiff's proposed SAC arises from the foregoing factual allegations. While the SAC asserts Count I rather expansively,[5] plaintiff's show cause briefing narrows Count I to a claim, brought through the vehicle of 42 U.S.C. § 1983, that Atty. Cahill, acting in his individual capacity, violated his federal constitutional right to due process by failing to provide the Board with: (1) one of the two settlement agreements that resulted from his suit against USC, *i.e.*, the one that sealed his disciplinary records; and (2) documents reflecting the AAMC's decision that he was under no

---

[5] As stated in plaintiff's proposed SAC, Count I is a claim, brought through 42 U.S.C. § 1983, that the Board, Penny Taylor, Atty. Cahill, and the individual members of the Board violated his federal constitutional rights to substantive and procedural due process by:

    a.   Employing confidential out of state and inaccurate settlement documents to [d]eprive [him] of his livelihood and publicly embarrass him;

    b.   Failing to consider the relevant documents provided by [him] in his defense;

    c.   Failing to honor the solemnity of a confidential Court Settlement Agreement;

    d.   Failing to honor [his] reasonable request to continue [his] hearing for medical reasons;

    e.   Failing to honor [his] reasonable request to continue the hearing for inclement weather; [and]

    f.   Fail[ing] to allow [his] reasonable request to participate electronically.

Doc. no. 51-1 ¶ 50.

App. 20

obligation to disclose his attendance at Keck in applications submitted through ERAS. According to plaintiff, the foregoing "documents, at the very least, would have weighed in favor of exonerating [him] and may have allowed him to exercise his constitutional right to practice medicine . . . [b]ut the documents appear nowhere in the Board's decision and the conclusion that must be drawn is that Attorney Cahill never provided them to the Board." Doc. no. 77, at 4.

## B.  Discussion

In document no. 70, the court dismissed the § 1983 claim that plaintiff asserted in his FAC because it was barred by the statute of limitations. In the course of rejecting plaintiff's argument for equitable tolling, the court cited a New Hampshire statute providing that "[n]o civil action shall be maintained against the board or any member of the board or its agents or employees with regard to any action or activity taken in the performance of any duty or authority established by this chapter." RSA 329:17, IX.[6] That statute, in turn, prompted the court to order plaintiff to show cause why the § 1983 claim he asserts in Count I of his proposed SAC is not futile, for failure to state a claim upon which relief can be granted. *See Glassman*, 90 F.3d at 623; *Barchock*, 886 F.3d at 48; *Abraham*, 553 F.3d at 117.

_____

[6] However, "[d]isciplinary or non-disciplinary remedial action taken by the board under [RSA 329:17] may be appealed to the supreme court under RSA 541." RSA 329:17, VIII.

App. 21

In response to the show cause order, plaintiff cites *Wang v. New Hampshire Board of Registration in Medicine* for the proposition that "immunity claims in section 1983 actions are governed by federal law." 55 F.3d 698, 701 (1st Cir. 1995) (citing *Martinez v. California*, 444 U.S. 277, 284 (1980)). Plaintiff's point is well taken, the Board does not dispute it, and the court agrees that Count I of plaintiff's proposed SAC is not barred by RSA 329:17, IX. That, however, is not the end of the story.

In addition to arguing that RSA 329:17, IX does not provide Atty. Cahill with immunity from his § 1983 claim, plaintiff goes on to argue that under the federal law that applies to § 1983 claims, Atty. Cahill is not immune from suit. The court does not agree.

In *Wang*, the Board of Registration in Medicine for the Commonwealth of Massachusetts revoked the medical license of a physician who was licensed in both Massachusetts and New Hampshire. *See* 55 F.3d at 699. Thereafter, the New Hampshire Board of Registration in Medicine "decided to investigate Wang's New Hampshire medical practice." *Id.* "[C]ounsel was appointed by the New Hampshire Board to investigate Wang's New Hampshire medical practice," *id.*, and ultimately, "the Board issued [a] written decision and order revoking Wang's New Hampshire medical license," *id.* at 700.

But, before the New Hampshire Board issued its revocation order, Wang asserted claims, pursuant to 42 U.S.C. § 1983, "against the Board, its members and

App. 22

counsel, in the United States District Court for the District of New Hampshire." *Wang*, 55 F.3d at 700. Thereafter, Wang's "claims for monetary relief against Board members and its counsel, in their individual capacities, were dismissed on grounds of absolute immunity." *Id.* The court of appeals affirmed. *See id.* at 701 (citing *Bettencourt v. Bd. of Reg. in Med.*, 904 F.2d 772, 782-85 (1st Cir. 1990)).

While Wang argued that *Bettencourt* was inapposite, "on the ground that the New Hampshire Board assumed an 'inquisitorial or investigative role' in [his] case by instigating and prosecuting the charges against him," *Wang*, 55 F.3d at 701, the court of appeals disagreed, explaining that:

> State officials performing prosecutorial functions – including their decisions to initiate administrative proceedings aimed at legal sanctions – are entitled to absolute immunity as well. *See Butz v. Economou*, 438 U.S. 478, 515 (1978); *see also Horwitz v. Board of Medical Examiners*, 822 F.2d 1508, 1515 (10th Cir. [(1987)]) (describing Colorado medical board officials' adjudicatory and prosecutorial role). Thus, New Hampshire Board counsel, like the Massachusetts Board professional staff, *see Bettencourt*, 904 F.2d at 785, is absolutely immune from suit, in his individual capacity, based on his participation in particular cases before the Board. *See id.*

*Wang*, 55 F.3d at 701 (parallel citations and subsequent history omitted).

App. 23

In light of *Wang*, and given the conduct on which plaintiff bases Count I of his SAC, *i.e.*, Atty. Cahill's obtaining evidence from him but failing to present it to the Board, it is difficult to see how Atty. Cahill would not be entitled to absolute immunity, *see Burns v. Reed*, 500 U.S. 478, 486 (1991) (observing that absolute immunity extends to "alleged deliberate suppression of exculpatory evidence") (citing *Imbler v. Pachtman*, 424 U.S. 409, 430-31 (1976)). But because "the official seeking absolute immunity bears the burden of showing that such immunity is justified," *Burns*, 500 U.S. at 486 (citing *Forrester v. White*, 484 U.S. 219, 224 (1988), *Malley v. Briggs*, 475 U.S. 335, 340 (1986), *Harlow v. Fitzgerald*, 457 U.S. 800, 812 (1982); *Butz*, 438 U.S. at 506), and because the Board claims only qualified immunity for Atty. Cahill, the court turns to the law of qualified immunity.

"Qualified immunity is a doctrine that shelters government officials from civil damages liability 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *McKenney v. Mangino*, 873 F.3d 75, 80 (1st Cir. 2017), *cert. denied*, No. 17-1147, 2018 WL 928274 (Mar. 19, 2018) (quoting *Harlow*, 457 U.S. at 818). In its most recent discussion of the mechanics of qualified immunity, the court of appeals explained:

> The standard for qualified immunity is familiar: as the Supreme Court stated this year, [government officials] are immune from suit under § 1983 unless "(1) they violated a

App. 24

federal statutory or constitutional right, and
(2) the unlawfulness of their conduct was
'clearly established at the time.'" *District of
Columbia v. Wesby*, ___ U.S. ___, 138 S. Ct. 577
(2018) (quoting *Reichle v. Howards*, 566 U.S.
658, 664 (2012)).

*Hill v. Walsh*, 884 F.3d 16, 21 (1st Cir. 2018) (parallel
citations omitted). The second step in the qualified im-
munity analysis itself has two components. *See
McKenney*, 873 F.3d at 81. Specifically:

> [T]he plaintiff must point to "'controlling au-
> thority' or a 'consensus of cases of persuasive
> authority'" that broadcasts "a clear signal to
> a reasonable official that certain conduct falls
> short of the constitutional norm." *Id.* at 76
> (quoting *Wilson* v. *Layne*, 526 U.S. 603, 617
> (1999)). Then, the court must evaluate
> "whether an objectively reasonable official in
> the defendant's position would have known
> that his conduct violated that rule of law." *Id.*
> These inquiries are carried out with the un-
> derstanding that qualified immunity is meant
> to shield "all but the plainly incompetent or
> those who knowingly violate the law." *White* v.
> *Pauly*, ___ U.S. ___, 137 S. Ct. 548, 551 (2017)
> (per curiam) (quoting *Mullenix* v. *Luna*, ___
> U.S. ___, 136 S. Ct. 305, 308 (2015) (per cu-
> riam)).

*Id.* (parallel citations omitted).

Here, the Board argues that Atty. Cahill is pro-
tected by qualified immunity because the conduct on
which Count I is based did not violate plaintiff's

App. 25

constitutional right to due process. The court agrees that Atty. Cahill is entitled to qualified immunity.

Turning to the first step in the qualified immunity analysis, it is important to accurately identify the constitutional right at issue. Plaintiff frames Count I in terms of his "constitutional right to practice medicine." Doc. no. 77, at 4. In *Conn v. Gabbert*, the Supreme Court explained that

> [i]n a line of earlier cases, [it had] indicated that the liberty component of the Fourteenth Amendment's Due Process Clause includes some generalized due process right to choose one's field of private employment, but a right which is nevertheless subject to reasonable government regulation.

526 U.S. 286, 291-92 (1999) (citing *Dent v. West Va.*, 129 U.S. 114 (1889); *Truax v. Raich*, 239 U.S. 33, 41 (1915)). *But see Medeiros v. Vincent*, 431 F.3d 25, 32 (1st Cir. 2005) ("The right to 'make a living' is not a 'fundamental right,' for either equal protection or substantive due process purposes.") (citing *N.Y. State Trawlers Ass'n v. Jorling*, 16 F.3d 1303, 1309-12 (2d Cir. 1994)).

If the constitutional right at issue in Count I is a substantive due process right to practice medicine, and presuming that plaintiff actually has such a right, the SAC does not allege that Atty. Cahill deprived plaintiff of that right. Dr. Isaacs's right to practice medicine in the state of New Hampshire, as a trainee, was revoked by operation of law upon his dismissal from his DHMC residency in March of 2012, before Atty. Cahill and the

App. 26

Board ever got involved with his case. Thus, plaintiff has failed to allege that anything that Atty. Cahill did or did not do deprived him of the right to practice medicine. Moreover, even if the reprimand the Board issued, two years after Dr. Isaacs's license was revoked, could somehow be construed as depriving Dr. Isaacs of the right to practice medicine in the future, that action was taken by the Board, not by Atty. Cahill.

If, on the other hand, the constitutional right at issue in Count I is a right to procedural due process, which is more in line with the factual allegations in plaintiff's SAC, Atty. Cahill is entitled to qualified immunity. In *Foster v. Ball*, a physician brought a claim that an investigator employed by a state medical board violated his right to equal protection by "intentionally exclud[ing] exculpatory evidence from [his] investigation report on a Medical Board complaint against [the physician]" on account of his race. 79 F. App'x 263, 264 (9th Cir. 2003). The evidence at issue was a favorable decision in an arbitration proceeding. *See id.* While the opinion in *Foster* focuses primarily on the plaintiff's equal protection claim, it includes the following relevant statement:

Dr. Foster also asserts a due process violation based on Ball's failure to include the exculpatory arbitration decision in his investigation report. However, even if there is a constitutional due process right to have an investigator in an administrative proceeding disclose exculpatory evidence in his investigation report, that right is not clearly established.

App. 27

*Id.* at 264 n.1.[7] Here, even if the subject of a disciplinary proceeding before an administrative tribunal has a constitutional due process right to have a hearing counsel present favorable evidence to the tribunal, plaintiff has identified no authority, either controlling or persuasive, that would have informed a reasonable official in Atty. Cahill's position that he would violate Dr. Isaacs's constitutional rights by failing to provide the Board with either the settlement agreement that sealed Dr. Isaacs's USC records or the AAMC's decision that Dr. Isaacs did not need to disclose his tenure at USC in subsequent ERAS applications. Accordingly, when Count I is cast as a procedural due process claim, Atty. Cahill is entitled to qualified immunity.

Because Atty. Cahill is entitled to qualified immunity, Count I of plaintiff's proposed SAC does not state a claim upon which relief can be granted. Thus, it would be futile for plaintiff to amend his FAC by adding Count I from his SAC.

The court concludes its discussion of plaintiff's show cause briefing by pointing out an additional

---

[7] The *Foster* court also noted that that the physician in that case, like Dr. Isaacs in this case, had known all along of the favorable evidence he faulted the investigator for failing to present to the administrative tribunal. Moreover, the Board's order in this case establishes that Dr. Isaacs was provided with an exhibit list before the hearing, *see* doc. no. 7-1, at 5, and had the opportunity to supplement the record, in the event he found the exhibit list lacking, *see id.* at 8 (citing N.H. Admin. R. Med. 206.09(c)). Thus, plaintiff had every opportunity to present the evidence that he faults Atty. Cahill for withholding from the Board.

App. 28

problem with his position. Near the end of his reply
brief, plaintiff makes the following argument:

> Attorney Cahill [if he had introduced the set-
> tlement agreement sealing Dr. Isaacs's Keck
> records and/or the AAMC e-mail] would have
> provid[ed] the key piece of evidence demon-
> strating the reason for Dr. Isaacs' omission of
> Keck <u>from his residency application</u>. Attorney
> Cahill's action in this regard deliberately de-
> prived the Board of Medicine of most likely
> the single most important piece of exculpatory
> evidence, which Attorney Cahill had every ob-
> ligation to provide in his role as an investiga-
> tor.

Doc. no. 83, at 3-4 (emphasis added).

While the evidence to which plaintiff refers may
have provided him with a valid reason for omitting
Keck from his residency application, the Board was not
dealing with that issue. The question before the Board
was whether to sanction Dr. Isaacs for omitting his at-
tendance at Keck, and his expulsion from Keck, from
his application for a New Hampshire training license,
not his ERAS application. *See* doc. no. 7-1, at 1. More-
over, it is difficult to see how either piece of evidence at
issue was even relevant to Dr. Isaacs's disciplinary pro-
ceeding before the Board, much less favorable to him.
First, while USC's agreement to seal Dr. Isaacs's edu-
cational records might have barred USC from disclos-
ing information about Dr. Isaacs's tenure there to third
parties, it is hard to see how a prohibition against
USC's disclosure of that information gave Dr. Isaacs a

App. 29

legal excuse for failing to disclose it, when asked a question that implicated it. The AAMC e-mail, in turn, pertained only to the information that Dr. Isaacs is obligated to disclose in an ERAS application; it did not give Isaacs permission to withhold information from a state medical licensing agency. In short, while the court appreciates plaintiff's unhappiness over the current state of his medical career, it does not appear that his current predicament is the result of any cognizable wrongdoing by Atty. Cahill.

## III. Conclusion

For the reasons described above, plaintiff's motion for relief from judgment, document no. 76, is denied, and his show cause briefing, document no. 77, is insufficient to save Count I of his proposed SAC. Accordingly, plaintiff's motion for leave to amend his FAC, document no. 51, is now denied in full. As a result, the clerk of the court shall close this case.

SO ORDERED.

/s/ Landya McCafferty
Landya McCafferty
United States District Judge

May 15, 2018

cc: Counsel of Record

App. 30

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE

Dr. Jeffrey Isaacs

     v.

Trustees of Dartmouth
College, NH Board of
Medicine, and Dartmouth-
Hitchcock Medical Center

Civil No. 17-cv-040-LM
Opinion No. 2018 DNH 016

## ORDER

Dr. Jeffrey Isaacs was a resident in psychiatry at Dartmouth-Hitchcock Medical Center ("DHMC") from June of 2011 until March of 2012, when DHMC dismissed him from its residency program. Dr. Isaacs challenged his dismissal in a previous action in this court, which resulted in summary judgment in favor of all defendants. See Isaacs v. Dartmouth-Hitchcock Med. Ctr., No. 12-CV-040-LM, 2014 WL 1572559 (D.N.H. Apr. 18, 2014).

In March of 2014, after conducting a hearing, the New Hampshire Board of Medicine ("Board") reprimanded Dr. Isaacs for omissions and misrepresentations in the application for a training license he had submitted to it. According to plaintiff's First Amended Complaint ("FAC"), which is the operative complaint in this case, his claims "arise out of the [Board's] February 5, 2014 Hearing, and their March 2014 Final Decision and Order." Doc. no. 40 at ¶ 6.

App. 31

In his FAC, plaintiff asserted nine claims. In previous orders, the court: (1) dismissed with prejudice all of the claims plaintiff asserted in Counts II, III, IV, V, VI, VII, and IX of the FAC, and all but one of the claims he asserted in Count VIII; (2) allowed plaintiff to move for leave to amend his FAC to reassert the one potentially viable claim in Count VIII, a claim for retaliation under the Americans With Disabilities Act ("ADA"), 42 U.S.C. § 12101-12213, asserted against DHMC and the Trustees of Dartmouth College ("Trustees"), arising from the disposition of his 2016 application for a residency; and (3) directed plaintiff to show cause why the constitutional claims he asserted against the Board and Attorney Jeff Cahill in Count I, by means of 42 U.S.C. § 1983, should not be dismissed as time barred.

Currently before the court are: (1) plaintiff's response to the show cause order, to which the Board has replied; and (2) plaintiff's motion for leave to amend his FAC, to which the Trustees, the Board, and DHMC all object.[1] In the seven count proposed Second Amended Complaint ("SAC") that plaintiff has attached to his motion for leave to amend, he asserts what he purports to be a timely § 1983 claim against the Board and Attorney Jeff Cahill (Count I) and an ADA retaliation claim against the Dartmouth defendants (i.e., the Trustees and DHMC) based upon the decision not to give him an interview when he applied for

---

[1] In document no. 61, plaintiff moved to strike the Trustees' objection to his motion for leave to amend. The court denied that motion, in an endorsed order dated January 3, 2018, but will construe it as a reply to the Trustees' objection.

App. 32

a residency in 2017 (Count V).[2] He also asserts five new claims: (1) a claim under Title IX of the Education Amendments of 1972, against the Dartmouth defendants (Count II of the proposed SAC); (2) a state law claim for fraud against the Board (Count III of the SAC); (3) a state law claim for civil conspiracy against the Dartmouth defendants and the Board (Count IV of the SAC); (4) a claim for retaliation, in violation of the Rehabilitation Act, 29 U.S.C. § 701 et seq., against the Dartmouth defendants (Count VI of the SAC); and (5) claims for disability discrimination under both the Rehabilitation Act and the ADA, against the Dartmouth defendants (Count VII of the SAC).

## I.   Section 1983 Claims (Count I)

### A.   Background

Unless otherwise indicated, the facts recited below are drawn from plaintiff's FAC or previous orders in this case.

Shortly after DHMC dismissed Dr. Isaacs from its residency program, it notified the Board that it had done so, and it also informed the Board that it believed that Dr. Isaacs had omitted material facts from the license application he had submitted to the Board. Those omissions concerned plaintiff's attendance at the University of Southern California ("USC") medical school. In October of 2013, the Board notified Dr. Isaacs

---

[2]  While enumerated as Count V in his proposed SAC, plaintiff's ADA retaliation claim is enumerated as Count VIII in his FAC.

App. 33

that it would hold a hearing on February 5, 2014, to determine whether he had committed professional misconduct by omitting information from, and making misrepresentations in, his application for a training license. On January 29, 2014, Dr. Isaacs asked the Board to stay his hearing, pending the outcome of a suit he had filed against it in the Eastern District of Pennsylvania, where he was then residing. He also asked to appear at his hearing remotely, because he was unable to drive to New Hampshire due to an unidentified medical condition.

The Board denied both of Dr. Isaacs's requests. In denying his request for a stay, the Board reasoned that Dr. Isaacs's pending action in the Eastern District of Pennsylvania had no bearing on the matter before it and further noted that under New Hampshire law, it was immune from suit. See doc. no. 7-1 at 5 (citing N.H. Rev. Stat. Ann. ("RSA") § 329:17, IX). On the morning of the day of his hearing, Dr. Isaacs notified the Board that he would be unable to attend because of inclement weather that precluded him from driving from Pennsylvania to New Hampshire that day. The hearing went on without him. Attorney Jeff Cahill served as the Board's hearing counsel.

After Dr. Isaacs's hearing, the Board issued a Final Decision and Order ("Order") which was signed by the Board's Administrator, Penny Taylor, and dated March 11, 2014. In its Order, the Board pointed out that Dr. Isaacs's training license had been cancelled by operation of law when he was dismissed from the DHMC residency program. But, the Board went on to

App. 34

reprimand Dr. Isaacs for omissions and misrepresentations in his application for that license.

With regard to how he learned of the Board's Order, plaintiff alleges: "The Board . . . failed to serve the final Order and Plaintiff did not receive the order by mail or email. Plaintiff found out about the Board's decision online, well after the date was up to appeal." Doc. no. 40 at ¶ 42. However, plaintiff does not allege either the date on which the Board posted its Order online or the date on which he first saw it. For its part, the Board has produced: (1) a declaration from Taylor stating that she mailed Dr. Isaacs a copy of the Board's Order on March 11, 2014, see doc. no. 66-1 at ¶ 2; and (2) a copy of a transmittal letter addressed to Dr. Isaacs, which was dated March 11, 2014, and which purported to enclose the Order. In any event, plaintiff now "acknowledges" the Board's production of an e-mail that he sent to Attorney Cahill and Taylor on March 26, 2014, which referred to the Board's decision, thus demonstrating that he knew of the decision no later than that date. See doc. no. 62 at ¶ 1; doc. no. 52 at ¶ 6; doc. no. 52-1.[3] Moreover, plaintiff has produced a copy

_____

[3] In his March 26 e-mail, Dr. Isaacs stated: "Please take notice that I will be appealing the February decision by the board. Please also take this email as a procedural request for reconsideration regarding the adverse weather conditions that prevented me from attending the hearing. . . ." Doc. no. 52-1. While plaintiff uses the term "reconsideration," his e-mail is better characterized as a request for a rehearing. See RSA 329:17, VIII (providing that appeals of Board decisions to the NHSC are governed by RSA 541); RSA 541:3 (establishing that application for a rehearing is the first step in the appeal process).

App. 35

of an e-mail he sent to Lynn Salvo on March 16, 2014, in which he stated that he had read the Board's decision, online, on March 15. See doc. no. 68-3.[4]

In October of 2014, plaintiff filed a motion with the Board that stated, in full: "Hereby Dr Jeffrey Isaacs motions to NH Board to cease the publication of disciplinary action, pending appeal of NH RSA 329:18-a noncompliance by the Board." Doc. no. 49 at ¶ 7. RSA 329:18-a outlines the procedures the Board must follow when conducting disciplinary hearings, and it appears that in his October 2014 motion, Dr. Isaacs was suggesting that the Board had violated RSA 329:18-a, IV, which provides that the Board's "decisions shall not be [made] public until they are served upon the parties." The Board's violation, according to plaintiff, was publishing its Order online before serving him with a copy of it. The Board denied Dr. Isaacs's motion in November of 2014, and he appealed that decision to the U.S. Supreme Court, which denied certiorari on May 21, 2015.

Dr. Isaacs filed his original complaint in this case on February 3, 2017. In July 2017, he filed his FAC, in which he first asserted claims, by means of § 1983, that

_____

[4] Regarding plaintiff's allegation that he did not find out about the Board's decision until "well after the date was up to appeal," doc. no. 40 at ¶ 42, the court notes that: (1) plaintiff has produced an e-mail he wrote on March 16, 2014, in which he stated that he had read the Board's decision; and (2) the statutes governing appeals from decisions made by the Board gave him until April 11, 2014, to begin the appeal process by applying to the Board for a rehearing, see RSA 329:17, VIII; RSA 541:3.

App. 36

Cahill, Taylor, and the individual members of the Board had violated his rights to procedural and substantive due process by:

a.  Employing <u>confidential</u> out of state and inaccurate settlement documents to [d]eprive [him] of his livelihood and publicly embarrass him;

b.  Failing to consider the relevant documents provided by [him] in his defense;

c.  Failing to honor the solemnity of a confidential Court Settlement Agreement;

d.  Failing to honor [his] reasonable request to continue the hearing for medical reasons;

e.  Failing to honor [his] reasonable request to continue the hearing for inclement weather; [and]

f.  Fail[ing] to allow [his] reasonable request to participate electronically.

FAC ¶ 52. The injury plaintiff claims is not the loss of his training license, which had been cancelled by operation of law before his hearing. Instead, the injury he claims is damage to his reputation, and to his ability to practice medicine, resulting from the publication of the Board's Order. See doc. no. 40 at ¶¶ 42, 45, 46, 49, 66.

Finally, while the § 1983 claims that plaintiff asserts in his SAC are identical to those in his FAC, he adds these new factual allegations to his SAC: "Dr. Isaacs

App. 37

moved to reconsider [the Board's March 11] order, a motion that was denied in April of 2014." Doc. no. 51-1 at¶ 64.

### B.  Discussion

In this section, the court discusses both the § 1983 claims in Count I of the FAC, as well as the proposed amendment to those claims in Count I of the SAC. For the reasons explained below, Count I of the FAC is dismissed as time barred. With respect to Count I of the SAC, and for the reasons explained below, the court orders further briefing.

The court begins its discussion with Count 1 of the FAC, and then turns to the same count in the SAC.

### 1.  Show Cause Briefing (Count I of FAC)

Plaintiff first asserted his § 1983 claims against Cahill, Taylor, and the individual members of the Board in his FAC, which he filed on May 1, 2017. In its show cause order, the court explained that on the record and arguments before it, plaintiff was not entitled to the benefit of the relation back doctrine, which, had it applied, would have established February 3, 2017, as the filing date for his § 1983 claims. Plaintiff does not argue the point in his show cause memorandum. Thus, the question before the court is whether May 1, 2017, falls within or outside the limitations period prescribed by New Hampshire law for personal injury actions. See Martínez-Rivera v. Puerto Rico, 812 F.3d 69,

App. 38

74 (1st Cir. 2016) (explaining that "[b]ecause section
1983 does not have its own statute of limitations . . .
courts use the personal-injury limitations period adopted
by the state where the injury supposedly occurred") (ci-
tations removed).

In New Hampshire, the statute that establishes
the limitations period for personal-injury actions pro-
vides that:

> [A]ll personal actions, except actions for slan-
> der or libel, may be brought only within 3
> years of the act or omission complained of,
> except that when the injury and its causal re-
> lationship to the act or omission were not dis-
> covered and could not reasonably have been
> discovered at the time of the act or omission,
> the action shall be commenced within 3 years
> of the time the plaintiff discovers, or in the ex-
> ercise of reasonable diligence should have dis-
> covered, the injury and its causal relationship
> to the act or omission complained of.

RSA 508:4, I. While federal courts adjudicating § 1983
claims "use the personal-injury limitations period
adopted by the state where the injury supposedly oc-
curred," Martínez-Rivera, 812 F.3d at 74, they "use fed-
eral law . . . to figure out when the limitation clock
starts ticking," id. The federal "rule is that the ticking
starts when [the plaintiff] knew or had reason to know
of the injury on which [his] claim rests." Id.; see also
Asociación de Suscripción Conjunta del Segura de Re-
sponsabilidad Obligatorio v. Jaurbe-Jiminez, 659 F.3d
42, 50 (1st Cir. 2011) ("Section 1983 claims accrue

App. 39

when the plaintiff knows, or has reason to know of the injury on which the action is based. . . ." (internal quotation marks removed)). And, "just as [the court] borrow[s] the state's limitations period in section—1983 cases, so too [does it] borrow the state's tolling rulings—unless of course they are hostile to federal interests." Martínez-Rivera, 812 F.3d at 77-75 (citing Rodríguez v. Mun. of San Juan, 659 F.3d 168, 173 (1st Cir. 2011); López-González v. Mun. de Comerío, 404 F.3d 548, 552 (1st Cir. 2005)).

Finally, as a general matter, "the statute of limitations is an affirmative defense with the defendant bearing the burden of establishing that a claim against it is time-barred." Rivera-Carrasquillo v. Centro Ecuestre Madrigal, Inc., 812 F.3d 213, 216 (1st Cir. 2016) (citing Asociación de Subscripción Conjunta del Seguro de Responsabilidad Obligatorio v. Juarbe-Jiménez, 659 F.3d 42, 50 n.10 (1st Cir. 2011)). The defendant's "burden . . . is met by a showing that the action was not brought within 3 years of the act or omission complained of." Beane v. Dana S. Beane & Co., 160 N.H. 708, 712 (2010) (internal quotation marks removed). With the foregoing principles in mind, the court turns to plaintiff's show cause memorandum.

In his memorandum, plaintiff posits two possible starting dates for the running of the limitations period on his § 1983 claims: (1) the date in November of 2014 on which the Board denied his motion to cease the publication of its March 11 Order; and (2) May 21, 2015, the date on which the U.S. Supreme Court denied certiorari on his appeal from the Board's November 2014

App. 40

decision. In his reply to the Board's response to his show cause memorandum, plaintiff appears to change course, focusing not on when the limitations period began to run but rather, suggesting that the running of the limitations period was tolled until the date on which the Board denied his motion in November of 2014. In the discussion that follows, the court begins by establishing when the limitations period began to run and then turns to the question of tolling.

According to the Board, plaintiff's § 1983 claims accrued on March 11, 2014, the date on which Penny Taylor signed the Board's Order. But according to plaintiff, his injury resulted not from the Board's decision itself, but from the publication of the Board's Order online. The Board has not indicated when the Order was published, much less that Dr. Isaacs knew of its publication on the day it was signed. Thus the limitations period did not begin to run on March 11. However, plaintiff has produced evidence that he knew of the publication of the Board's Order by March 15, 2014.[5] Therefore, any cause of action that plaintiff

---

[5] Plaintiff does say that "[t]he confusion resulting from the lack of publication to [him] led to confusion for him about the issue through November of 2014," doc. no. 49 at ¶ 6, and "that the Board's failure to send the document to him in the normal course caused him reasonable confusion for some time after the order had been entered," doc. no. 62 at ¶ 1. Plaintiff does not say anything further about his confusion or its consequences, and he does not dispute the fact that the Board had published its Order online by March 15, 2014. There is also no dispute that the publication of that Order is the act that triggered the injury he claims to have suffered as a result of the alleged constitutional violations on which he based his § 1983 claims.

App. 41

might have against the Board arising from the manner in which it conducted his hearing and drafted its Order accrued on that date.

Plaintiff did not file his § 1983 claims against Cahill, Taylor, and the individual members of the Board until May 1, 2017. That is more than three years after any such claims would have accrued. Accordingly, the Board has carried its burden of proving that, to the extent that plaintiff had any cognizable § 1983 claims in the first instance, those claims were time barred by the time he filed them on May 1, 2017.

Because the Board has carried its burden of proving that plaintiff's § 1983 claims are time barred, those claims can survive only if plaintiff can establish that the limitations period was tolled for an amount of time long enough to have kept it running past May 1, 2017. The availability of tolling is a question of New Hampshire law. See Martínez-Rivera, 812 F.3d at 74-75.

In his show cause memorandum, without identifying any legal authority, plaintiff argues that the running of the limitations period was tolled by the motion he filed with the Board in October of 2014. In his reply, after identifying Dobe v. Commissioner, New Hampshire Department of Health & Human Services, 147 N.H. 458 (2002), as the legal authority entitling him to the benefit of tolling, plaintiff argues:

> By filing a request for administrative appeal, that was subsequently denied, the damages he incurred began at the date of the denial and therefore equitable tolling is appropriate

App. 42

> here. Moreover, the Board's denial of the mo-
> tion, to some degree, concedes they didn't com-
> ply with RSA, and had no intent of correcting
> the matter. In such a case, willful noncompli-
> ance with RSA should certainly toll the stat-
> ute of limitations.

Doc. no. 62 at ¶ 6.

Plaintiff's reliance upon Dobe is misplaced. In Dobe, the New Hampshire Department of Health and Human Services ("DHHS") "issued a notice [on July 9, 1996] stating that [a] report of child abuse [against Christopher Dobe] was founded, notwithstanding the lack of any physical evidence that [his] daughter [the alleged victim] had been sexually abused." 147 N.H. at 459. In a subsequent divorce proceeding, the marital master made an award of custody that was favorable to Dobe, and raised numerous concerns about the investigation on which DHHS relied to determine that the abuse allegations against Dobe were founded. See id. Dobe then "appealed the [July 1996] DHHS finding to the DHHS Office of Program Support Administrative Hearings Division," id., which ultimately "reversed the earlier finding that the report of plaintiff's sexual abuse of his daughter was founded," id. at 460. In February of 2000, Dobe sued DHHS and various individuals asserting claims arising from the investigation that led to the July 1996 finding. Id. The trial court dismissed the claim against all defendants as time barred, explaining that Dobe's cause of action had accrued on July 9, 1996, the day that DHHS issued its

adverse finding, which was more than three years before Dobe filed suit. Id.

On appeal, Dobe argued that his "administrative appeal of the July 1996 finding tolled the running of the statute of limitations." Id. After explaining that "the statute of limitations period [may be] 'tolled during a pending administrative proceeding [if] that proceeding is a prerequisite to pursuit of the civil action,'" id. at 461-62 (quoting N.H. Div. of Human Servs. v. Allard, 138 N.H. 604, 606 (1994)), the New Hampshire Supreme Court affirmed the trial court, explaining that tolling was not warranted because Dobe's administrative appeal "was not a prerequisite to [his] civil lawsuit," id. at 462.

Here, in plaintiff's view, the "request for administrative appeal," doc. no. 62 at ¶ 6, that he filed in October of 2014 entitles him to tolling under the general principle stated in Dobe, i.e., that "the statute of limitations period [may be] tolled during a pending administrative proceeding [if] that proceeding is a prerequisite to pursuit of the civil action." 147 N.H. at 461-62 (internal quotation marks removed). There are several problems with plaintiff's reliance on Dobe.

First, the pleading that plaintiff filed with the Board in October of 2014 was not a request for an administrative appeal of the Board's Order. Rather, it was, in its own words, a "motion[] [asking the] Board to cease the publication of disciplinary action, pending appeal of NH RSA 329:18-a noncompliance by the Board." Doc. no. 49 at ¶ 7 (emphasis added). In other

App. 44

words, plaintiff's pleading was more like a motion to stay the execution of a judgment than a substantive appeal of a judgment.

Second, not only was plaintiff's October filing with the Board not an appeal of the Board's March 11 Order, the appeal to which plaintiff's motion referred was an appeal of an issue entirely unrelated to the § 1983 claims that plaintiff asserts in Count I of his FAC. In his October 2014 motion, plaintiff referred to a pending appeal of the Board's failure to send him a copy of its Order before it published that Order online, in violation of RSA 329:18-a, IV. In Count I, plaintiff claims that he was denied due process by the manner in which the Board handled his hearing and drafted the Order that resulted therefrom, but he does not claim that the Board violated his right to due process by publishing its Order online before mailing it to him. Thus, this case is on all fours with Dobe, in which the New Hampshire Supreme Court held that the limitations period on the plaintiff's claim was not tolled because the administrative proceeding on which the plaintiff based his tolling argument did not involve any claim that the plaintiff was making in his civil suit. See 147 N.H. at 462.

There is a third problem with plaintiff's reliance upon Dobe. Dobe says that "the statute of limitations period is not tolled during a pending administrative proceeding unless that proceeding is a prerequisite to pursuit of the civil action." 147 N.H. at 461-62 (internal quotation marks removed). Here, the administrative proceeding in which plaintiff engaged was not

App. 45

a prerequisite to his filing a civil action to challenge the Board's handling of his disciplinary proceeding. To the contrary, the statute governing the Board's disciplinary proceedings expressly provides that:

> [N]o civil action shall be maintained against the board or any member of the board or its agents or employees with regard to any action or activity taken in the performance of any duty or authority established by this chapter.

RSA 329:17, IX (emphasis added). So, rather than providing a basis for tolling the limitations period for plaintiff's § 1983 claims, the statute governing the Board's disciplinary process would appear to affirmatively bar such claims in the first place.

Because the limitations period for the § 1983 claims plaintiff asserts in his FAC started to run no later than March 15, 2014, and was never tolled, plaintiff had until March 15, 2017, to file those claims. See RSA 508:4, I. He did not file them until May 1, 2017, approximately six months after the limitations period had run. Therefore, those claims are time barred. Accordingly, Count I of plaintiff's FAC is dismissed.

### 2.   Second Amended Complaint (Count I of SAC)

In addition to addressing the § 1983 claim from his FAC in his show cause briefing, plaintiff also includes a slightly revised § 1983 claim in his proposed SAC. In the interest of completeness, the court will

App. 46

address plaintiff's revised § 1983 claim under the standard applicable to motions to amend.

At this juncture, plaintiff "may amend [his FAC] only with the opposing party's written consent or the court's leave." Fed. R. Civ. P. 15(a)(2). Leave to amend should be freely given "when justice so requires." Id. Even so, "a district court may deny leave to amend when the request is characterized by 'undue delay, bad faith, futility, or the absence of due diligence on the movant's part.'" Mulder v. Kohl's Dep't Stores, Inc., 865 F.3d 17, 20 (1st Cir. 2017) (quoting Nikitine v. Wilmington Trust Co., 715 F.3d 388, 390 (1st Cir. 2013); citing Foman v. Davis, 371 U.S. 178, 182 (1962)) (internal brackets removed). For the purposes of Rule 15(a)(2), "'[f]utility' means that the complaint, as amended, would fail to state a claim upon which relief could be granted." Glassman v. Computervision Corp., 90 F.3d 617, 623 (1st Cir. 1996) (citing 3 Moore's Federal Practice ¶ 15.08[4], at 15-80 (2d ed. 1993); Vargas v. McNamera, 608 F.2d 15, 17 (1st Cir. 1979)).

A complaint fails to state a claim upon which relief can be granted when "viewing all the factual allegations in the complaint as true . . . [and] drawing all reasonable inferences in [the plaintiff's] favor," it still does not present "sufficient factual material to state a facially plausible claim." Vargas-Colón v. Fundación Damas, Inc., 864 F.3d 14, 23 (1st Cir. 2017) (citing O'Shea ex rel. O'Shea v. UPS Ret. Plan, 837 F.3d 67, 77 (1st Cir. 2016)). "[I]f the proposed amendment would be futile because, as thus amended, the complaint still fails to state a claim, the district court acts within its

App. 47

discretion in denying the motion to amend." <u>Abraham v. Woods Hole Ocean. Inst.</u>, 553 F.3d 114, 117 (1st Cir. 2009) (quoting <u>Bos. & Me. Corp. v. Hampton</u>, 987 F.2d 855, 868 (1st Cir. 1993)).

As the court has noted, plaintiff makes two new allegations in Count I of his SAC: that he moved for reconsideration of the Board's March 11 Order, and that his motion was denied in April of 2014. Based upon those allegations, there is an argument to be made that Count I of the SAC is not time barred, presuming that the limitations period on the § 1983 claims asserted therein did not begin to run until some time in May of 2014, at the end of the period for appealing the Board's denial of reconsideration to the New Hampshire Supreme Court ("NHSC"). <u>See</u> RSA 329:17, VIII (providing that appeals of Board decisions to the NHSC are governed by RSA 541); RSA 541:6 (establishing 30 day deadline for appealing Board's denial of a request for rehearing to the NHSC). However, even if the § 1983 claims in plaintiff's SAC are not time barred, it is difficult to see how they would survive RSA 329:17, IX, which bars civil actions arising from Board actions. Accordingly, plaintiff shall have until March 7, 2018, to show cause why his motion to amend, as to Count I, should not be denied as futile.

## II. ADA Retaliation Claim (Count V)

In a previous order, the court dismissed, with prejudice, plaintiff's claims that the Dartmouth defendants retaliated against him for asserting an ADA claim

App. 48

against them in 12-cv-40-LM by failing to interview
him after he submitted applications for a residency at
DHMC in 2013, 2014, 2015, and 2016. Dismissal, in
turn, was based upon plaintiff's failure to plead that
he had exhausted the administrative remedies avail-
able to him to challenge defendants' asserted retalia-
tion. However, as to Dr. Isaacs's 2016 application,
dismissal was without prejudice. On the chance that
the time to exhaust a claim based upon the disposition
of Dr. Isaacs's 2016 application had not yet expired, the
court allowed plaintiff "to file a motion for leave to
amend his FAC to assert a properly exhausted ADA re-
taliation claim based upon his most recent rejection for
a residency." Doc. no. 48 at 39.

In Count V of his proposed SAC, plaintiff asserts
that in retaliation for his having brought an ADA claim
against the Dartmouth defendants in 12-cv-40-LM, they
responded to his 2017 application for a residency by
declining to give him an interview.[6] He does not, how-
ever, allege that he has exhausted the administrative
remedies available to him through the Equal Employ-
ment Opportunity Commission ("EEOC"). Exhaustion
is a necessary prerequisite for making a claim that de-
fendants retaliated against him for exercising his
rights under Title I of the ADA, see Rivera-Díaz v. Hu-
mana Ins. of P.R., Inc., 748 F.3d 387, 389 (1st Cir. 2014),

---

[6] In other words, plaintiff is not seeking to amend his FAC to
assert a properly exhausted ADA retaliation claim arising from
the disposition of his 2016 application; he is seeking to add an
entirely new claim arising from the disposition of his 2017 appli-
cation.

App. 49

and it is beyond dispute that plaintiff's ADA claim in 12-cv-40-LM arose under Title I of the ADA. Plaintiff acknowledges that he has not alleged that he has exhausted his administrative remedies, but he asserts that the exhaustion requirement does not apply to his claim and that, if it does, the time for filing a charge with the EEOC has not yet expired.

For reasons that the court explained in a previous order, document no. 48, the exhaustion requirement does apply to the retaliation claim that plaintiff asserts in Count V of his proposed SAC. Because he has not alleged that he has filed a timely charge with the EEOC or that he has received a right-to-sue letter from the EEOC, plaintiff has not alleged that he has exhausted his administrative remedies. See Rivera-Díaz, 748 F.3d at 390. As a result, Count V of plaintiff's proposed SAC does not state a claim upon which relief can be granted. For that reason, as to plaintiff's ADA retaliation claim, his motion to amend is denied as futile. See Abraham, 553 F.3d at 117. That said, if at some point in the future, plaintiff should happen to file a timely charge with the EEOC and receive a right-to-sue letter, then he may file an ADA retaliation claim in a separate action.

## III.   Counts II, III, IV, VI, and VII

In addition to seeking to amend the two claims from his FAC that were not dismissed, plaintiff also seeks leave to assert five new claims in his SAC. As for those five new claims, DHMC argues that:

App. 50

Plaintiff's attempt to file his second amended complaint should be summarily denied because it was filed in contravention of the Court's prior order allowing him to amend his first amended complaint solely to "assert a properly exhausted ADA retaliation claim based upon the rejection of his 2016 application to DHMC for a residency."

Doc. no. 59 at ¶ 1 (quoting doc. no. 48 at 8). The Trustees and Board also note that plaintiff's SAC goes beyond the scope of the court's invitation to amend the FAC and further argue that plaintiff's motion for leave to amend should be denied, in its entirety, on grounds of undue delay. However, all three defendants address plaintiff's five new claims on the merits by arguing that it would be futile for plaintiff to amend his FAC by adding them. For that reason, and out of abundance of caution, in deference to plaintiff's pro se status, and in recognition of the importance of the interests at issue, the court will consider each of the five new claims plaintiff seeks to add to his FAC.

A.  Title IX (Count II)

Count II of plaintiff's proposed SAC is a claim under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a), against the Dartmouth defendants. Plaintiff claims that defendants are liable to him under Title IX for failing to investigate a complaint he made in March of 2014, to the president of Dartmouth College, that during the first week of his DHMC residency, one of his supervisors, Dr. Simon Khagi, sexually

App. 51

assaulted him by ordering "him [to] perform two pros-
tate exams [on patients] under false pretenses." Doc.
no. 51-1 at ¶ 83.

Plaintiff's Title IX claim has a long history. The
purported sexual assaults on which that claim is prem-
ised occurred in June of 2011. In a pleading in 12-cv-
40-LM, plaintiff: (1) identified Dr. Khagi's orders as the
factual predicate for a claim for intentional infliction of
emotional distress; and (2) referred to a pending Title
IX claim in a case in the U.S. District Court for the
Eastern District of Pennsylvania based on defendants'
failure to investigate the prostate exams. See Emer-
gency Mot. for Recons. Add. at 8, Isaacs v. Dartmouth-
Hitchcock Med. Ctr., No. 12-cv-40-LM (Apr. 19, 2014),
ECF No. 148. To his motion in 12-cv-40-LM, plaintiff
attached an undated letter to the U.S. Department of
Education Office for Civil Rights in which he: (1) char-
acterized the order to perform unnecessary prostate
exams as "hazing," id., Ex. B, ECF No. 148-2; (2) indi-
cated that Dartmouth's former and current presidents
had refused to investigate the matter, id.; and (3) rep-
resented that he was litigating "a Title IX claim for
failure to investigate the assault and hazing" in the
Eastern District of Pennsylvania, id.

In his original complaint in this case, plaintiff in-
cluded a claim that the Dartmouth defendants violated
Title IX when they failed to investigate the prostate
exams. That claim was not asserted in plaintiff's FAC,
but has reappeared in his proposed SAC.

App. 52

Under Title IX, "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Moreover:

> Sexual harassment in schools can constitute prohibited sex-based discrimination actionable under Title IX where there is a "hostile environment," such that "acts of sexual harassment [are] sufficiently severe and pervasive to compromise or interfere with educational opportunities normally available to students," and relevant school officials with actual knowledge of the harassment "exhibit[] deliberate indifference to [the harassment]." [Frazier v. Fairhaven Sch. Comm., 276 F.3d 52] 65, 66 [ (1st Cir. 2001) ]. . . . The purportedly illegal acts must be taken "on the basis of sex." See Frazier, 276 F.3d at 66 ("Discrimination on the basis of sex is the sine qua non of a Title IX sexual harassment case, and a failure to plead that element is fatal.").

Morgan v. Town of Lexington, 823 F.3d 737, 745 (1st Cir. 2016). To state a sexual harassment claim under Title IX, a plaintiff must allege "(1) that [he] was a student, who was (2) subjected to harassment (3) based upon sex; (4) that the harassment was sufficiently severe and pervasive to create an abusive educational environment; and (5) that a cognizable basis for institutional liability exists." Frazier, 276 F.3d at 66 (citing

App. 53

Brown v. Hot, Sexy & Safer Prods., Inc., 68 F.3d 525,
540 (1st Cir. 1995)).

Plaintiff is not claiming that the Dartmouth de-
fendants are liable for a Title IX violation based upon
Dr. Khagi's conduct in 2011; he is claiming Title IX li-
ability arising from defendants' failure to investigate
his 2014 complaint about Dr. Khagi's conduct. Title IX,
however, does not expressly impose upon educational
institutions a duty to investigate claims of sexual har-
assment, nor does it expressly give students a claim
against institutions that fail to do so. That said, even if
the court presumes that Title IX does impose liability
for failure to investigate, "[i]n the absence of conduct
creating a sex-based hostile educational environment,
. . . [such a failure] is not actionable under Title IX."
Frazier, 276 F.3d at 67 (emphasis added) (citing Karib-
ian v. Columbia Univ., 930 F. Supp. 134, 137 (S.D.N.Y.
1996) ("If what occurs is an employer's failure to inves-
tigate and take remedial measures in response to a
complaint of discrimination [based upon Title VII], and
if it turns out that no actual discrimination has oc-
curred, then there is nothing which actually consti-
tutes any conduct banned by the statute.") (emphasis
added)). Thus, to state a Title IX claim for failure to
investigate, a plaintiff must adequately allege that
what the defendant failed to investigate was discrimi-
nation in the form of sexual harassment; failure to in-
vestigate something that was not sexual harassment
does not violate Title IX.

The problem with plaintiff's Title IX claim is that
even if ordering Dr. Isaacs to perform two unnecessary

App. 54

prostate exams was sufficiently severe or pervasive to create a hostile environment, plaintiff has failed to make any allegations that, if proven, would establish that Dr. Khagi's conduct toward him constituted harassment "on the basis of [his] sex," Morgan, 823 F.3d at 745. In his SAC, plaintiff alleges that at some point after Dr. Khagi ordered him to perform the two prostate exams at issue, he "learned that no medical necessity existed for those exams." SAC ¶ 74. He then alleges that "[k]nowing that these examinations were unnecessary, [he] suffered knowing that he had been ordered to take part in the indecent assault of a patient." SAC ¶ 75 (emphasis added). Subsequently in his SAC, when describing his e-mail to Dartmouth's president, plaintiff alleges that he "informed Dartmouth that he had been the victim of a sexual assault because Dr. Khagi had him perform two prostate exams under false pretenses." SAC ¶ 83 (emphasis added). But merely calling himself the victim of a sexual assault, in the absence of any factual allegations that would support such a conclusion, is insufficient to state a claim that defendants failed to investigate a claim of sexual harassment. See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) ("A pleading that offers labels and conclusions . . . will not do. Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement.") (internal citations and quotation marks removed). At worst, defendants may have failed to investigate Dr. Isaacs's claim that Dr. Khagi ordered him to perform an unnecessary medical procedure. But given plaintiff's factual allegations about Dr. Khagi's conduct, defendants did not fail to investigate a claim that

App. 55

Dr. Khagi sexually assaulted or sexually harassed
Dr. Isaacs, and it is a failure to investigate harassment
of Dr. Isaacs, based upon his sex, that could, potentially,
expose the Dartmouth defendants to Title IX liability.

In sum, there are no allegations in Count II of
plaintiff's SAC that, if proven, would entitle him to
prevail on a Title IX sexual harassment claim against
the Trustees or DHMC. Thus, amending his FAC to add
such a claim would be futile.

### B.   Fraud (Count III)

Count III of plaintiff's proposed SAC is a claim for
fraud against the Board, arising from various alleged
"mistruths and half-truths about [him]," doc. no. 51-1
at ¶ 93, that the Board included in its March 11, 2014,
Order. The Board argues that as to Count III, amend-
ment would be futile for two different reasons, Elev-
enth Amendment sovereign immunity and lack of
subject matter jurisdiction. Even if the Board is not en-
titled to sovereign immunity, and even if the court has
subject matter jurisdiction over plaintiff's fraud claim,
amending his FAC to add Count III of his proposed
SAC would be futile because Count III does not state
an actionable claim for fraud.

Under the common law of New Hampshire, the el-
ements of a claim for fraud, or intentional misrepre-
sentation, are as follows:

"'[O]ne who fraudulently makes a misrep-
resentation . . . for the purpose of inducing
another to act or to refrain from action in

App. 56

reliance upon it, is subject to liability to the
other in deceit for pecuniary loss caused to
him by his justifiable reliance upon the mis-
representation.'" <u>Gray v. First NH Banks</u>, 138
N.H. 279, 283 (1994) (quoting <u>Restatement
(Second) of Torts</u> § 525, at 55 (1977)).

<u>Tessier v. Rockefeller</u>, 162 N.H. 324, 331-32 (2011) (in-
ternal citations removed). It is well established, and
plaintiff acknowledges, that to prevail on a claim of in-
tentional misrepresentation, "a plaintiff must demon-
strate justifiable reliance." SAC ¶ 92 (quoting <u>Snierson
v. Scruton</u>, 145 N.H. 73, 77 (2000)). Moreover, the reli-
ance at issue is reliance by the plaintiff. <u>See</u> <u>Tessier</u>,
162 N.H. at 332.

Here, plaintiff does not allege that he ever relied
upon the purported mistruths and half-truths in the
Board's March 11 Order. Rather, he alleges that false
statements in the Order have caused him continuing
injury because no hospital to which he has applied for
a residency has given him an interview, and that "[t]he
availability of [the March 11 Order] and the extent of
the falsehood [in it] indicates that the hospitals deny-
ing [him interviews] are relying on those falsehoods."
Doc. no. 51-1 at ¶ 96. In other words, plaintiff is not
claiming pecuniary loss as a result of <u>his</u> justifiable re-
liance upon the alleged misrepresentations in the
March 11 Order; he is claiming that he has suffered a
loss as a result of reliance by the hospitals that have
declined to interview him. But to state a claim for in-
tentional misrepresentation, plaintiff must allege "pe-
cuniary loss caused to him by <u>his</u> justifiable reliance

App. 57

upon the misrepresentation." <u>Tessier</u>, 162 N.H. at 332 (emphasis added).

Because Count III of plaintiff's proposed SAC does not allege that he suffered pecuniary loss resulting from his justifiable reliance upon any statement made by the Board, he has failed to state a claim against the Board for intentional misrepresentation. <u>Cf.</u> <u>Isaacs</u>, 2014 WL 1572559, at *24 ("[T]here is no evidence that Dr. Isaacs relied, to his detriment, on any of the statements that form the basis for his fraud claim. Thus, defendants are entitled to judgment as a matter of law on [that] claim."). Accordingly, amending plaintiff's FAC to add a claim for intentional misrepresentation would be futile.

### C.  Civil Conspiracy (Count IV)

Count IV of plaintiff's proposed SAC is a claim for civil conspiracy against the Trustees, the Board, and DHMC. Count IV is supported by the following allegations:

> It is alleged . . . that Dartmouth agents could not help themselves from willfully participating in a joint prosecution with the State against Dr. Isaacs, manipulating the Board adjudicatory process, providing confidential sealed documents, and prejudicing the Board, resulting in the deprivation of rights as described more fully herein. Essentially, the State Board, and individuals connected therewith were doing the bidding of Dartmouth as

App. 58

they worked together hand in hand to violate
and deny the Plaintiff his rights.

Doc. no. 51-1 at ¶ 15. Based upon the foregoing, plain-
tiff asserts that the three defendants conspired to:
(1) publish a sealed settlement agreement that had
resulted from his lawsuit against the USC medical
school "in order to publicly humiliate [him] and destroy
his medical career," id. ¶ 99; and (2) refuse to investi-
gate his claim that he was subjected to sexual harass-
ment when Dr. Khagi ordered him to perform two
unnecessary prostate exams.

Under New Hampshire law, to state a claim for
civil conspiracy, a plaintiff must allege facts sufficient
to establish five elements:

> (1) two or more persons . . . ; (2) an object to be
> accomplished (i.e., an unlawful object to be
> achieved by lawful or unlawful means or
> a lawful object to be achieved by unlawful
> means); (3) an agreement on the object or
> course of action; (4) one or more unlawful
> overt acts; and (5) damages as the proximate
> result thereof.

In re Armaganian, 147 N.H. 158, 163 (2001) (quoting
Jay Edwards, Inc. v. Baker, 130 N.H. 41, 47 (1987)).

Here, plaintiff's civil conspiracy claim founders on
the third element. While Count IV uses a quotation
from Jay Edwards to define civil conspiracy, see doc. no.
51-1 at ¶ 98, plaintiff does not set out the elements of
such a claim, and, as a general matter, paragraph 15 of
his SAC is a textbook example of "naked assertion[s]

App. 59

devoid of further factual enhancement," <u>Iqbal</u>, 556 U.S. at 678 (internal quotation marks removed). More specifically, his complaint does not allege facts that, if proven, would establish the existence of an agreement among the three purported coconspirators, or an agreement between any two of them. That is fatal to both components of plaintiff's claim. <u>See</u> <u>Vargas-Colón</u>, 864 F.3d at 22 (affirming dismissal of claim where "the amended complaint contain[ed] absolutely no factual allegations with respect to the first element of the brothers' derivative claim") (citing <u>Portugués-Santana v. Rekomdiv Int'l, Inc.</u>, 725 F.3d 17, 26-27 (1st Cir. 2013) (affirming dismissal under Rule 12(b)(6) where complaint's allegations failed to establish element necessary to make out plausible claim)).

There is also a problem with the second element of a civil conspiracy claim as to plaintiff's assertion that defendants conspired to refuse to investigate his claims of sexual harassment. To state a claim for civil conspiracy, a plaintiff must allege "an object to be accomplished (i.e., an unlawful object to be achieved by lawful or unlawful means or a lawful object to be achieved by unlawful means)." <u>In re Armaganian</u>, 147 N.H. at 163. As the court has already explained, because plaintiff has failed to adequately allege that Dr. Khagi subjected him to sexual harassment in 2011, he has failed to allege that the Dartmouth defendants owed him a duty, under Title IX, to investigate his claims against Dr. Khagi. Furthermore, plaintiff has not identified any other legal authority under which defendants owed him a duty to investigate his claims

App. 60

against Dr. Khagi. Nor has plaintiff alleged that defendants engaged in any illegal act that caused DHMC to not investigate his harassment claim. Thus, he has failed to adequately allege the second element of a civil conspiracy claim.

DHMC also suggests that plaintiff's proposed civil conspiracy claim is time barred, and that is certainly correct with respect to plaintiff's claim that defendants conspired to publish a sealed settlement agreement from his USC litigation. The settlement agreement was published no later than March 15, 2014. Plaintiff first asserted his civil conspiracy claim in his proposed SAC, which was filed on November 14, 2017. Even if plaintiff were to be given the benefit of the relation back doctrine, which does not seem to apply, his original complaint was still filed after the expiration of the limitations period. Given that the other object to be accomplished on which plaintiff bases his civil conspiracy claim is an inaction rather than an action, i.e., refusing to investigate his sexual harassment claim against Dr. Khagi, it is more difficult to determine when the limitations period began to run on that part of plaintiff's claim but, as the court has explained, plaintiff has provided the court with no basis to conclude that defendants' alleged failure to act was either something unlawful achieved through lawful or unlawful means, or something lawful achieved through unlawful means.

In sum, because Count IV of plaintiff's proposed SAC does not state a claim upon which relief can be

App. 61

granted for civil conspiracy, amending plaintiff's FAC to add such a claim would be futile.

### D.  Disability Discrimination (Count VII)

Count VII of plaintiff's proposed SAC is a claim that the Dartmouth defendants violated both the Rehabilitation Act and the ADA by failing to consider his applications for a residency because they regarded him as being disabled.

Section 504 of the Rehabilitation Act prohibits discrimination based upon a person's disability by programs or activities receiving federal financial assistance. See 29 U.S.C. § 794(a). "[T]o prevail on [a] § 504 claim, [plaintiff] must prove . . . (1) that [he] is disabled; (2) that [he] sought services from a federally funded entity; (3) that [he] was 'otherwise qualified' to receive those services; and (4) that [he] was denied those services 'solely by reason of [his] . . . disability.'" Lesley v. Hee Man Chie, 250 F.3d 47, 52-53 (1st Cir. 2001).

The ADA, in turn, prohibits disability discrimination in employment (Title I), in the provision of public services (Title II), and in places of public accommodation operated by private entities (Title III). In an attempt to avoid the exhaustion requirement that applies to Title I claims, plaintiff asserts the ADA claim in Count VII under Title III of the ADA. Be that as it may, to state a claim under either Title I or Title III, plaintiff must allege that he is disabled. See Gillen v. Fallon Ambulance Serv., Inc., 283 F.3d 11, 20 (1st Cir.

App. 62

2002) (Title I failure to hire claim); <u>Dudley v. Hanna-ford Bros. Co.</u>, 333 F.3d 299, 307 (1st Cir. 2003) (Title III claim).

The Rehabilitation Act defines the term "individual with a disability" to mean "any person who has a disability as defined in section 12102 of Title 42." 29 U.S.C. § 705(20)(B). That statutory provision, which is a part of the ADA, defines the term "disability" to mean "a physical or mental impairment that substantially limits one or more major life activities," 42 U.S.C. § 12102(1)(A), or "being regarded as having such an impairment," § 12102(1)(C), so long as "the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity," § 12102(3).[7]

Plaintiff's sole allegation concerning his status as a person with a disability is that "[u]pon information and belief Dartmouth is refusing to consider [his] applications because they believe him to be disabled." Doc. no. 51-1 at ¶ 123. In other words, he relies upon the ADA's "regarded as" definition of disability.[8] To

---

[7] While the following definition has no application to this case, the ADA also defines "[t]he term 'disability' [to] mean[ ] . . . a record of [a physical or mental] impairment [that substantially limits one or more major life activities]." 42 U.S.C. § 12102(1)(B).

[8] In his motion to strike the Trustees' objection to his motion to amend, which the court has construed as a reply, plaintiff appears to abandon his reliance upon the "regarded as" definition of disability. Instead, he contends that "[D]artmouth's own summary judgment documents [presumably in 12-cv-40-LM] assert

App. 63

prove disability under that definition, a plaintiff "must present evidence . . . that [the defendant] subjectively believed either (1) [the plaintiff] 'has a substantially limiting impairment' that he doesn't have, or (2) [the plaintiff] 'has a substantially limiting impairment when, in fact, the impairment is not so limiting.'" EEOC v. BNSF Ry. Co., 853 F.3d 1150, 1155-56 (10th Cir. 2017) (quoting Sutton v. United Air Lines, Inc., 527 U.S. 471, 489 (1999)). "Under both tests, [the court] ask[s] whether the employer mistakenly believed that the plaintiff was substantially limited in performing a major life activity." BNSF, 853 F.3d at 1156 (citing Justice v. Crown Cork & Seal Co., 527 F.3d 1080, 1086 (10th Cir. 2008)).

Here, plaintiff makes no factual allegations about what any defendant believed about his limitations. He merely asserts that "[u]pon information and belief Dartmouth is refusing to consider [his] applications because they believe him to be disabled." SAC ¶ 123. But, he alleges no facts that would support his belief, such as the reasons given for the disposition of his applications or statements made by decisionmakers that indicate or imply beliefs about his capacities or

─────────

that Plaintiff had a neuropsychiatric disability," Doc. no. 61 at ¶ 15, and argues that under principles of res judicata, defendants' assertions in 12-cv-40-LM are sufficient to establish the disability element of his claims under the Rehabilitation Act and the ADA. However, the question before the court concerns what plaintiff alleges in his SAC about what defendants believed about his limitations when deciding whether to interview him for a residency, not what may have been written in some unidentified summary judgment document in another case.

App. 64

limitations. In other words, plaintiff merely "tenders naked assertions[] devoid of further factual enhancement." Iqbal, 556 U.S. at 678 (internal quotation marks removed). That is not enough to nudge his disability discrimination claims "across the line from conceivable to plausible." Iqbal, 556 U.S. at 680 (internal quotation marks removed). (quoting Twombly, 550 U.S. at 570). Accordingly, amending plaintiff's FAC to add Count VII of his SAC would be futile.

### E.   Rehabilitation Act Retaliation (Count VI)

In Count VI of his proposed SAC, plaintiff alleges that "[i]n March of 2013 [he] effectively filed a Rehabilitation Act claim with OCR," doc. no. 51-1 at ¶ 115, and that in retaliation for doing so, DHMC responded to his 2013, 2014, 2015, 2016, and 2017 applications for a residency by declining to give him an interview.

The elements of a Rehabilitation Act retaliation claim are as follows:

> To establish a prima facie claim for retaliation under . . . the Rehabilitation Act, [plaintiff] would have to show that [he] "engaged in protected conduct," [was] "subjected to an adverse action by the defendant," and "there was a causal connection between the protected conduct and the adverse action."

Lebrón v. Puerto Rico, 770 F.3d 25, 31 (1st Cir. 2014) (quoting D.B. ex rel. Elizabeth B. v. Esposito, 675 F.3d 26, 41 (1st Cir. 2012)) (footnote removed).

App. 65

The first problem with plaintiff's claim concerns the element of protected conduct. Plaintiff alleges that in March of 2013, he "<u>effectively</u> filed a Rehabilitation Act claim with OCR." Doc. no. 51-1 at ¶ 115 (emphasis added). But he does not say what he means by "effectively" filing a Rehabilitation Act claim, as opposed to actually filing such a claim. Nor does he indicate what OCR stands for. That, in turn, makes it difficult to know whether OCR has any role in adjudicating Rehabilitation Act claims in the first place, and if OCR does not adjudicate Rehabilitation Act claims, it is difficult to see how filing a Rehabilitation Act claim with that entity, either effectively or actually, would be protected conduct under the Rehabilitation Act.

In light of the vagueness of plaintiff's SAC, the court has scoured the record to gain a better understanding of the conduct he means to allege to satisfy the first element of his Rehabilitation Act retaliation claim. In his original complaint, plaintiff alleged that "[o]n March 16th [2013] the Office of Civil Rights notified Defendant Dartmouth of a pending HIPPA [Health Insurance Portability and Accountability Act] investigation." Doc. no. 1 at ¶ 94. If, indeed, Dr. Isaacs took some action that led the Office of Civil Rights to initiate a HIPPA investigation, and if the Office of Civil Rights is the "OCR" to which plaintiff refers in Count VI of his complaint, it would not appear that filing a HIPPA complaint is protected conduct for the purposes of a Rehabilitation Act retaliation claim.

There is one other possibility. In 12-cv-40-LM, plaintiff submitted to the court an undated letter he

App. 66

had addressed to the U.S. Department of Education Office for Civil Rights.[9] In that letter, he stated:

> The nature of my complaint is that I was hazed and abused by my supervisors and professors, because they wanted to oust me for being a student who had previously filed ADA litigation pertaining to a head injury I sustained from an intoxicated Dartmouth student back in 1997.

Isaacs, No. 12-cv-40-LM, doc no. 148-2. Nowhere does the letter quoted above say anything about the Rehabilitation Act, much less charge either of the Dartmouth defendants with violating it. Thus, if the above quoted letter is, in fact, the OCR complaint that plaintiff claims to be his protected conduct, it does not qualify as such.

In sum, plaintiff has failed to state a Rehabilitation Act retaliation claim because he has not adequately alleged that he ever engaged in any protected conduct. However, even assuming that plaintiff did engage in protected conduct by filing a Rehabilitation Act claim with the OCR, he has failed to adequately allege the third element, a causal link between his protected conduct and the adverse actions taken against him.

---

[9] In a complaint that plaintiff filed against the U.S. Department of Education in the U.S. District Court for the District of Massachusetts, Dr. Isaacs appears to indicate the letter he submitted to the court in 12-cv-40-LM was dated April 19, 2014. See doc. no. 65-1 at ¶ 5.

App. 67

With respect to causation, "for an . . . action to be retaliatory, the person taking that action must have known about the . . . protected conduct at the time he or she took the allegedly retaliatory action." <u>Taite v. Shineski</u>, No. 08-cv-258-SM, 2010 WL 745160, at *19 (D.N.H. Mar. 1, 2010) (citing <u>Pomales v. Celulares Telefónica, Inc.</u>, 447 F.3d 79, 85 (1st Cir. 2006)).

Here, while plaintiff alleges that he "effectively filed a Rehabilitation Act claim with OCR," SAC ¶ 115, he does not allege anything about the substance of that claim or the party or parties against whom he asserted it. That matters because plaintiff is not asserting a typical retaliation claim, in which the protected conduct was directly targeted at the defendant, as when an employee claims that her employer retaliated against her for asking for a reasonable accommodation for a disability. Because plaintiff does not allege protected conduct that was directly targeted at any defendant, there is no basis for assuming that any defendant ever knew about the claim plaintiff says he effectively filed with OCR. Yet, plaintiff does not allege that he ever served any defendant with his OCR complaint, or that OCR ever forwarded his complaint to any defendant. Indeed, he alleges that his OCR "claim was later dismissed for being untimely," doc. no. 51-1 at ¶ 115, an action that OCR could well have taken without ever notifying any defendant of the claim it was dismissing.

The Trustees have identified the causation problem with Count VI, arguing that

App. 68

> Dr. Isaacs does not allege that he named the
> Trustees of Dartmouth College [in his OCR
> complaint], or that the Trustees were aware of
> the Office of Civil Rights Complaint that he
> asserts gives rise to his retaliation claim, such
> that the Trustees or any of their agents could
> plausibly be said to have taken any adverse
> action against him in retaliation for the com-
> plaint.

Doc. no. 54-1 at 8. Plaintiff responds:

> Defendant brings the argument that no evi-
> dence that the Trustees of Dartmouth College
> were aware of the Office of Civil Rights com-
> plaint has been given. The Defendant does not
> claim that the Trustees of Dartmouth College
> were not aware of the complaint, just that it
> has not been stated. This kind of illogical ar-
> gument not found supported by the record has
> no place here. If the Defendant would like to
> present evidence that they did not receive
> notice they are free to do so at Summary Judg-
> ment, however the amount of ink the Defend-
> ant has spent discussing the other aspects
> of Plaintiff's previous actions indicates that
> they have been following his activities very
> closely, making it unlikely that they would not
> be aware of that action.

Doc. no. 61 at ¶ 17. Plaintiff mischaracterizes the Trus-
tees' argument. They do not argue that no evidence has
been produced; they argue that plaintiff has not ade-
quately alleged that they knew about his OCR com-
plaint, which is essential to state a retaliation claim.
They are correct. Because plaintiff has not adequately

App. 69

alleged that the Dartmouth defendants knew about his OCR complaint, amendment to add the retaliation claim asserted in Count VI of his SAC would be futile.

## IV.   Conclusion

For the reasons described above, the court issues the following set of rulings:

### **Show Cause Briefing re: Count I of FAC**

Plaintiff has failed to show cause why the § 1983 claims in his FAC are not time barred. Accordingly, Count I of the FAC is dismissed with prejudice.

### **Motion for Leave to Amend FAC**

Amending plaintiff's FAC to add the claims he asserts in Counts II, III, IV, V, VI, and VII of his SAC, or an ADA retaliation claim based upon the disposition of his 2017 residency application, would be futile. Accordingly, as to those claims, plaintiff's motion for leave to amend his FAC, document no. 51, is denied, but with the proviso that he is free to assert a properly exhausted ADA retaliation claim in a subsequent action.

After denying plaintiff's motion for leave to amend with respect to the above claims, all that remains are the § 1983 claims that plaintiff asserts in Count I of his SAC. As to those claims, plaintiff shall have until March 7, 2018, to show cause why they are not barred by RSA 329:17, IX. Plaintiff's show cause briefing shall be limited to that single issue. If plaintiff

App. 70

fails to show cause why Count I of his SAC is not barred by that statute, the court will deny plaintiff's motion for leave to amend in full and will direct the clerk of the court to close the case.

SO ORDERED.

/s/ Landya McCafferty
_____
Landya McCarfferty
United States District Judge

February 5, 2018

cc: All counsel and pro se parties of record.

App. 71

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE

Dr. Jeffrey Isaacs

    v.

Trustees of Dartmouth College, NH Board of Medicine, and Dartmouth-Hitchcock Medical Center

Civil No.
17-cv-040-LM
Opinion No.
2017 DNH 230

## <u>ORDER</u>

Asserting claims that arise from a decision by the New Hampshire Board of Medicine ("Board") to reprimand him, after he was dismissed from a residency program in psychiatry operated by Dartmouth-Hitchcock Medical Center ("DHMC"), Dr. Jeffrey Isaacs has sued the Board, DHMC, and the Trustees of Dartmouth College ("Trustees"). As a result of a previous order, this case now consists of: (1) substantive and procedural due process claims, brought by means of 42 U.S.C. § 1983, against the Board's attorney, its Administrator, and the individual members of the Board (Count I);[1] (2) a disability discrimination claim under Title II of the Americans With Disabilities Act ("ADA"), see 42 U.S.C. § 12132, against the Board (Count III); (3) an ADA retaliation claim, see 42 U.S.C. § 12203, against the Board (Count IV); (4) a claim for

_____

[1] The individuals named as defendants in Count I of the FAC have yet to be served. In an endorsed order dated October 12, 2017, the court extended the time for serving those individuals until 60 days after the date of this order.

App. 72

prospective injunctive relief against the Board (Count V); and (5) an ADA retaliation claim against DHMC and the Trustees (Count VIII). Before the court are: (1) plaintiff's response to an order directing him to show cause why Counts IV and VIII should not be dismissed for failure to exhaust administrative remedies; (2) the Board's motion to dismiss plaintiff's First Amended Complaint ("FAC"); and (3) the Trustees' motion to dismiss the FAC. For the reasons that follow, both motions to dismiss are granted. But before turning to those motions, the court addresses ADA exhaustion, which is the subject of the parties' show cause briefing.

## I.   ADA Exhaustion

Count IV asserts an ADA retaliation claim against the Board, and Count VIII asserts an ADA retaliation claim against DHMC and the Trustees. In its show cause order, the court noted that in Rivera-Díaz v. Humana Insurance of Puerto Rico, Inc., the court of appeals held that

> [c]laims of employment discrimination and retaliation under the ADA are subject to the procedural requirements of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-5 to-9. See 42 U.S.C. §§ 12117(a), 12203(c); Loubriel v. Fondo del Seguro del Estado, 694 F.3d 139, 142 (1st Cir. 2012). Under this procedural regime, litigation "is not a remedy of first resort" for either discrimination or retaliation cases. Jorge [v. Rumsfeld], 404 F.3d [556,] 558-59 [(1st Cir. 2005)]. Rather, a

App. 73

> would-be plaintiff must first exhaust his ad-
> ministrative remedies. This task embodies
> "two key components: the timely filing of a
> charge with the EEOC and the receipt of a
> right-to-sue letter from the agency." Id.

748 F.3d 387, 389-90 (1st Cir. 2014). In his response to
the show cause order, which incorporates by reference
his objection to the Board's motion to dismiss, plaintiff
argues that because his retaliation claims arise under
Titles II and III of the ADA rather than Title I, he was
under no obligation to exhaust administrative reme-
dies before bringing those claims in court.

Of course, plaintiff's retaliation claims do not
arise under Titles II and III; like all ADA retaliation
claims, they arise under 42 U.S.C. § 12203, which was
enacted under Title V of the ADA.[2] That said, the dis-
tinction that plaintiff draws between Title I of the ADA
and Titles II and III does have some bearing on the ex-
haustion question.

In Rivera-Díaz, the plaintiff brought a Title I dis-
ability discrimination claim against his former em-
ployer, and a Title V retaliation claim that was based
upon allegations that his former employer had taken
adverse actions against him in response to his having

---

[2] To clarify, Subchapters I, II, and III of Chapter 126 of the
U.S. Code originated in Titles I, II, and III of the ADA, i.e., Public
Law 101-336, but Subchapter IV (which includes the ADA anti-
retaliation provision) began its life as Title V of the ADA, not Title
IV. Title IV has no cognate in Chapter 126; it pertains to telecom-
munications and is codified at 47 U.S.C. §§ 225 and 611.

App. 74

asserted his rights under Title I of the ADA.[3] The court held that both the discrimination claim and the retaliation claim were subject to the exhaustion requirement. Thus, the rule of <u>Rivera-Díaz</u> is that when the protected conduct in an ADA retaliation claim is the exercise or vindication of a right granted by Title I, which pertains to disability discrimination by employers, the Title V retaliation claim is subject to the same exhaustion requirement as a Title I discrimination claim. That is, such a retaliation claim must be adjudicated through the EEOC before it may be brought in court. <u>See</u>, <u>e.g.</u>, <u>Kelly v. N. Shore-Long Island Jewish Health Sys.</u>, 166 F. Supp. 3d 274, 288 (E.D.N.Y. 2016); <u>Knaub v. Tulli</u>, 788 F. Supp. 2d 349, 359 (M.D. Pa. 2011).

But when a plaintiff claims to have been retaliated against for exercising or vindicating a right granted by Title II (disability discrimination in the provision of services by a public entity) or Title III (disability discrimination in the provision of public accommodations and services operated by private entities), which do not concern disability discrimination by employers, courts have not required exhaustion through the EEOC. <u>See Cable v. Dep't of Devt'l Servs.</u>, 973 F. Supp. 937, 940 (C.D. Cal. 1997) ("Plaintiff's Title V claims rely on acts and practices Plaintiff alleges were unlawful under

---

[3] To prevail on an ADA retaliation claim, "a plaintiff must [prove] that (1) he or she engaged in protected conduct, (2) he or she was subjected to an adverse action by the defendant, and (3) there was a causal connection between the protected conduct and the adverse action." <u>D.B. ex rel. Elizabeth B. v. Esposito</u>, 675 F.3d 26, 41 (1st Cir. 2012) (citations omitted).

App. 75

Title II of the ADA. Thus, Plaintiff was not required to
exhaust administrative remedies before filing this ac-
tion.") rev'd on other grounds, 54 Fed.Appx. 263 (9th
Cir. 2002); <u>McInerney v. Rensselaer Poly. Inst.</u>, 505 F.3d
135, 139 (2d Cir. 2007) ("[W]e hold that there is no ad-
ministrative-exhaustion requirement for ADA Title III
claims or Title V claims predicated on asserting one's
rights under Title III).

With the foregoing principles in mind, the court
begins with the retaliation claim plaintiff asserts in
Count VIII, and then turns to the retaliation claim he
asserts in Count IV.

### A.   Count VIII

In Count VIII, plaintiff asserts that he was sub-
jected to two different sets of adverse actions by the
Trustees and DHMC because he engaged in the pro-
tected conduct of suing them in a previous case in this
court, 12-cv-40-LM. <u>See</u> FAC ¶¶ 131, 140. In 12-cv-40-
LM, Dr. Isaacs asserted an ADA discrimination claim
against the Trustees, DHMC, and Mary Hitchcock Me-
morial Hospital, and his claim was strictly limited to
discrimination in employment, under Title I.[4] Thus,

---

[4] While plaintiff says that "[t]he Defendants throughout this
action have labeled themselves as employers when it is conven-
ient for them," Pl.'s Mem. (doc. no. 39) ¶ 19, the court notes that
in 12-cv-40-LM, it was <u>plaintiff</u> who alleged, in support of his ADA
claim, that "DHMC is considered an employer under the act," Am.
Compl. ¶ 43, <u>*Isaacs v. Dartmouth-Hitchcock Med. Ctr.*</u>, No. 12-cv-
40-LM (D.N.H. Feb. 6, 2013), ECF No. 54. Nowhere in 12-cv-40-
LM did plaintiff characterize any of the defendants as public

App. 76

before he can bring the retaliation claim he asserts in
Count VIII in this court, he must exhaust his adminis-
trative remedies. See Rivera-Díaz, 748 F.3d at 389. He
has not alleged that he has done so. Accordingly, the
Trustees are entitled to dismissal of Count VIII.[5] More-
over, while DHMC has not moved to dismiss Count
VIII, the foregoing analysis applies with equal force to
plaintiff's retaliation claim against DHMC. Thus, as to
DHMC, Count VIII is dismissed sua sponte. See
Garayalde-Rijos v. Mun. of Carolina, 747 F.3d 15, 23
(1st Cir. 2014) (explaining that sua sponte dismissal is
appropriate "where 'it is crystal clear that the plaintiff
cannot prevail and that amending the complaint would
be futile'") (quoting Chute v. Walker, 281 F.3d 314, 319
(1st Cir. 2002)).

Plaintiff attempts to avoid the reach of Rivera-
Díaz by arguing that Count VIII should not be dis-
missed because he pled Title III retaliation against an
educational institution, which does not require admin-
istrative exhaustion. Plaintiff is mistaken. First of all,
as the court has explained, there is no such thing as
Title III exhaustion. But, more importantly, Count VIII
asserts a claim that the Trustees retaliated against
plaintiff for suing them in 12-cv-40-LM, and the com-
plaint in 12-cv-40-LM asserts a claim against the

_____

entities providing services or as private entities providing public
accommodations, nor did he invoke any rights granted by Title II
or Title III of the ADA.

    [5] Because the Trustees are entitled to dismissal as a result
of plaintiff's failure to exhaust his administrative remedies, the
court need not address the other issues raised in the Trustees'
motion to dismiss.

App. 77

Trustees and DHMC, under Title I, for disability discrimination in employment. Nowhere in the complaint in 12-cv-40-LM did plaintiff assert a Title III claim against any defendant. Because plaintiff is not now claiming, in Count VIII, that the Trustees or DHMC retaliated against him for asserting any right granted by Title III, the rule stated in <u>McInerney</u>, 505 F.3d at 139, does not excuse him from the exhaustion requirement.

Both the Trustees and DHMC are entitled to dismissal of the ADA retaliation claims that plaintiff asserts against them in Count VIII due to plaintiff's failure to exhaust the administrative remedies available to him. Moreover, those claims are, with one exception, dismissed with prejudice. The acts of retaliation alleged in Count VIII include: (1) "poison[ing] the well with the Board and needlessly push[ing] for a censure," FAC ¶ 133; and (2) rejecting applications for admission to the DHMC residency program that he filed in 2013, 2014, 2015, and 2016, <u>see</u> FAC ¶ 141. With the possible exception of the most recent rejection of a residency application, none of the acts of purported retaliation that plaintiff alleges in support of Count VIII took place recently enough for plaintiff to file a timely charge with the EEOC. <u>See</u> 42 U.S.C. § 2000e-5(e)(1); N.H. Rev. Stat. Ann. ("RSA") 354-A:21, III; <u>Bonilla v. Muebles J.J. Alvarez, Inc.</u>, 194 F.3d 275, 278 (1st Cir. 1999)). The precise timing of plaintiff's most recent residency application is not entirely clear. In paragraph 141 of his FAC, plaintiff alleges that he "applied for federal residency at DHMC in 2013, 2014, 2015,

and 2016," and in paragraph 145, he alleges that "Dart-mouth actively rejected [his] applications on multiple occasions between 2013 and 2017." Thus, depending upon the date of plaintiff's most recent rejection, there remains a possibility that a retaliation claim based upon the most recent rejection could still be adminis-tratively exhausted. Accordingly, Count VIII is dis-missed with prejudice, except that plaintiff may, if possible, assert a properly exhausted ADA retaliation claim based upon the rejection of his 2016 application to DHMC for a residency.

### B.   Count IV

In Count IV, plaintiff claims that he was subjected to three different adverse actions by the Board be-cause, among other things, he asked the Board for a reasonable accommodation that would have allowed him to participate in his disciplinary hearing. Asking for a reasonable accommodation from a public entity is conduct directed to vindicating a right granted by Title II of the ADA. Thus, plaintiff was not obligated to ex-haust administrative remedies before bringing the re-taliation claim he asserts in Count IV. See Cable, 973 F. Supp. at 940. Accordingly, the court cannot dismiss Count IV on the basis of plaintiff's failure to exhaust.

## II.   The Board's Motion to Dismiss

This case includes three claims against the Board: (1) the ADA discrimination claim plaintiff asserts in Count III; (2) the ADA retaliation claim he assert in

App. 79

Count IV; and (3) the claim for prospective injunctive relief he asserts in Count V. The Board moves to dismiss Counts III, IV, and V, arguing that the court lacks subject matter jurisdiction over the claims asserted therein, see Fed. R. Civ. P. 12(b)(1), and that even if the court has subject matter jurisdiction, plaintiff has failed to state a claim upon which relief can be granted, see Fed. R. Civ. P. 12(b)(6). In addition, the Board asks the court to dismiss Count I, sua sponte. In this section, the court begins with a brief recitation of the relevant factual allegations and then considers, in turn, each of the three claims the Board moves to dismiss as well as the claim the Board urges the court to dismiss on its own motion.

A.   Background

The court assumes the reader's familiarity with its previous order in this case, document no. 34, and provides a truncated recitation of the relevant facts.

In March of 2012, DHMC dismissed Dr. Isaacs from his residency. In its letter of dismissal, DHMC identified four grounds for its action, including Dr. Isaacs'" omission of material information from [his] Electronic Residency Application Service (ERAS) application [and] falsification of information provided to the New Hampshire Board of Medicine." Compl., Ex. K (doc. no. 3-11), at 1. The letter went on to describe the factual basis for its charges of omission and falsification:

App. 80

> [Y]our ERAS application lacked information regarding your prior residency training in Arizona as well as time served as a medical student at the University of Southern California. You also failed to divulge your dismissal from medical school at USC in information provided to the New Hampshire Board of Medicine in support of a NH training license.

Id.

Shortly after DHMC dismissed Dr. Isaacs, it notified the Board of its action and informed the Board of its belief that Dr. Isaacs had omitted material facts from the license application he had submitted to the Board. "As a result of [the] information [the Board received from DHMC], the Board commenced an investigation to determine whether [Dr. Isaacs] committed professional misconduct pursuant to RSA 329:17, VI and RSA 329:18." Def.'s Mot. to Dismiss, Ex. 1 (doc. no. 7-1), at 1.

In October of 2013, the Board notified Dr. Isaacs that a hearing had been scheduled for February 5, 2014. According to the decision the Board issued after Dr. Isaacs's hearing, its "Notice [of Hearing] informed [Dr. Isaacs] . . . that failure to appear [could] result in the hearing being held in absentia with disciplinary sanctions imposed without further notice or opportunity to be heard." Def.'s Mot. to Dismiss, Ex. 1 (doc. 7-1), at 2. On January 29, 2014, Dr. Isaacs notified the Board that he had filed suit against it in federal court in Pennsylvania and asked the Board to stay his hearing, presumably pending the outcome of his action in

App. 81

Pennsylvania. He also stated that he was "unable to drive to NH for medical reasons," Compl., Ex. R (doc. no. 3-18), at 1, and asked to appear at his hearing remotely, by telephone or video conference, in the event that his request for a stay was denied. Dr. Isaacs did not identify the "medical reasons" that prevented him from driving to New Hampshire. The Board denied Dr. Isaacs's request for a stay and also denied his request to appear remotely. On the morning of the day of his hearing, which was scheduled for 1:00 p.m., Dr. Isaacs sent the Board an e-mail indicating that he would not be attending because it was impossible for him to drive to New Hampshire from Pennsylvania, under inclement weather conditions, in the rental car he was then using. The hearing went on as scheduled, without Dr. Isaacs. According to the Board's Final Decision and Order ("Order"), which is dated March 11, 2014, "Attorney Jeff Cahill appeared as hearing counsel." Def.'s Mot. to Dismiss, Ex. 1 (doc. no. 7-1), at 4.

The Board's Order was signed by Penny Taylor, in her capacity as Administrator and Authorized Representative of the New Hampshire Board of Medicine. In it, the Board noted that DHMC's dismissal of Dr. Isaacs resulted in the cancellation of his medical license as a matter of law. But, it also issued a reprimand, based upon its findings that when Dr. Isaacs applied for his license, he "knowingly made a false

App. 82

statement and further failed to disclose a material fact." Def.'s Mot. to Dismiss, Ex. 1 (doc. no. 7-1), at 8-9.[6]

## B.   Count III: ADA Discrimination

In Count III, plaintiff claims that the Board violated Title II of the ADA by: (1) "requir[ing] a disabled individual to drive through 8" of snow from Philadelphia," FAC ¶ 80, to attend his hearing rather than granting him the reasonable accommodation of a remote appearance; (2) failing to include evidence he had e-mailed before the hearing; and (3) failing to provide him with timely notice of its decision. For those purported ADA violations, "plaintiff seeks all lawful damages, costs, attorneys fees[,] interest[,] and an Order deleting, retracting, or otherwise removing the Board's decision from publication or dissemination." FAC ¶ 84. While plaintiff claims to be disabled, his complaint includes no factual allegations about the impairment that purportedly disables him.

The nature of the remedy that plaintiff seeks is at the heart of the Board's argument that the court lacks subject matter jurisdiction over plaintiff's ADA claims. The Board construes plaintiff's request for an order "deleting, retracting, or otherwise removing the Board's decision from publication," FAC ¶¶ 84, 92, 100,

---

[6] The false statement was Dr. Isaacs's answer of "no" to a question about whether he had ever "been 'reprimanded, sanctioned, restricted or disciplined in any activities involving medical education . . . ,'" Def.'s Mot. to Dismiss, Ex. 1 (doc. no. 7-1), at 6, and the material fact he failed to disclose was his attendance at the U.S.C. medical school, see id. at 7-8.

as an attempt to have this court stand in review of that decision, which, the Board argues, is impermissible under the Rooker-Feldman doctrine. See Bettencourt v. Bd. of Reg. in Med., 721 F. Supp. 382, 384 (D. Mass. 1989) ("A federal court has no jurisdiction to review a decision of a state administrative agency that is judicial in nature.") (citing D.C. Court of Appeals v. Feldman, 460 U.S. 462 (1983)).

Plaintiff counters by arguing that the Rooker-Feldman doctrine is inapplicable here because he "is not seeking to overturn the Board's decision or to have this Court review the Board's Order." Pl.'s Obj. (doc. no. 37) ¶ 11. Rather, according to plaintiff, he "seeks monetary damages to make him whole for the Board's violations of the ADA, and/or an Order minimizing the detrimental effects of the publication of the erroneous, extraneous and defamatory language needlessly contained in the Order." Id. However, in his FAC, plaintiff states that he "is not seeking compensation in the present action." FAC ¶ 19 (emphasis added). He "clarifies" that statement in a footnote:

> Although plaintiff wishes to make it clear that he is not actively seeking monetary compensation, and instead seeks equitable relief to rescind and retract the Board Decision and be re-admitted to Dartmouth, he is not waiving his claims to monetary compensation if it is awarded by Judge or Jury. For purposes of maintaining an active case or controversy at law, plaintiff seeks money damages, and only wishes to make clear here that he has not filed

App. 84

> the suit for that base purpose, but instead to
> correct the record and return to medicine.

FAC ¶ 19 n.3.

As a preliminary matter, the court cannot see how a request for the deletion, retraction, or removal of the Board's decision is not also a request to overturn that decision. Similarly, given that one of the three acts of purported discrimination that plaintiff identifies in Count III involves the manner in which the Board handled evidence while adjudicating his case,[7] plaintiff is clearly asking the court to review the Board's order. Indeed, it seems self-evident that for the court to grant plaintiff the equitable relief he seeks, the court would have to determine that the Board would have ruled in plaintiff's favor had it not committed the ADA violations that plaintiff alleges. But, the court could not do that without reviewing the Board's decision. For that reason, to the extent plaintiff asks the court to order the deletion, retraction, or removal of the Board's decision, Count III is "an attempt by plaintiff to seek appellate review," Bettencourt, 721 F. Supp. at 384, of the Board's Order. Such a review is precluded by the Rooker-Feldman doctrine. See id.

The court's conclusion that plaintiff's ADA discrimination claim is, at least in part, an impermissible bid for appellate review is reinforced by the nature of the equitable relief plaintiff seeks. In Dufresne v.

---

[7] In like manner, two of the three acts of purported retaliation that plaintiff identifies in Count IV involve the manner in which the Board handled evidence while adjudicating his case.

App. 85

Veneman, the court of appeals pointed out that "injunctive relief under the ADA is limited to 'reasonable accommodations,'" 114 F.3d 952, 954 (9th Cir. 1997) (per curiam) (quoting Alexander v. Choate, 469 U.S. 287, 301 (1985)). Here, Count III is a claim that the Board violated the ADA by failing to provide plaintiff with a reasonable accommodation for his disability. Yet, he does not ask the court to order the Board to provide him with a reasonable accommodation; he asks the court to order the Board to retract its decision against him. That Count III seeks equitable relief that is not available under the ADA is further support for the court's conclusion that to the extent that plaintiff requests such relief, the claim for which he seeks it is a request for appellate review, not an ADA claim.

However, plaintiff also asks for monetary damages, and to the extent that he seeks that form of relief, the foregoing analysis does not apply, and the court would appear to have subject matter jurisdiction. But that is not enough to save Count III. As to the part of plaintiff's ADA discrimination claim over which the court has subject matter jurisdiction, the Board is entitled to dismissal under Rule 12(b)(6) of the Federal Rules of Civil Procedure.

Under Rule 12(b)(6), the court must accept the factual allegations in the complaint as true, construe reasonable inferences in the plaintiff's favor, and "determine whether the factual allegations in the plaintiff's complaint set forth a plausible claim upon which relief may be granted." Foley v. Wells Fargo Bank, N.A., 772 F.3d 63, 71 (1st Cir. 2014) (citation

App. 86

omitted). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). Analyzing plausibility is "a context-specific task" in which the court relies on its "judicial experience and common sense." Id. at 679.

Count III asserts a claim under Title II of the ADA, which provides, in pertinent part:

> no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132. Beyond that, "Title II imposes an affirmative obligation on public entities to make their programs accessible to qualified individuals with disabilities, except where compliance would result in a fundamental alteration of services or impose an undue burden." Toledo v. Sánchez, 454 F.3d 24, 32 (1st Cir. 2006) (citing Parker v. Univ. de P.R., 225 F.3d 1, 5 (1st Cir. 2000); 28 C.F.R. § 35.150).

To prevail on a claim under Title II of the ADA, a plaintiff must prove:

> (1) that he is a qualified individual with a disability; (2) that he was either excluded from participation in or denied the benefits of some public entity's services, programs, or activities or was otherwise discriminated against; and

App. 87

(3) that such exclusion, denial of benefits, or discrimination was by reason of the plaintiff's disability.

Buchanan v. Maine, 469 F.3d 158, 170-71 (1st Cir. 2006) (quoting Parker, 225 F.3d at 5). As for the second element, ADA discrimination can take several different forms including disparate treatment, see Nunes v. Mass. Dep't of Corr., 766 F.3d 136, 144 (1st Cir. 2014) (citations omitted), disparate impact, see id. at 145 (citations omitted), and the form of discrimination at issue here: "refus[al] to affirmatively accommodate [a] disability where such accommodation was needed to provide 'meaningful access to a public service,'" id. (quoting Henrietta D. v Bloomberg, 331 F.3d 261, 273-76 (2d Cir. 2003)).

The Board argues that plaintiff has not adequately alleged the first element of his claim, i.e., that he is a qualified individual with a disability. The court agrees.

Title II of the ADA defines the term "qualified individual with a disability" to mean:

an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.

App. 88

42 U.S.C. § 12131(2). The ADA defines the term "disability" to mean "a physical or mental impairment that substantially limits one or more major life activities." 42 U.S.C. § 12102(1)(A).[8] Major life activities, in turn,

> include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working.

42 U.S.C. § 12102(2)(A).

In Toledo, the plaintiff survived a motion to dismiss by alleging, with respect to the first element of his Title II claim, that he had "a mental impairment, schizoaffective disorder, that substantially limits the major life activity of learning." 454 F.3d at 32. Unlike the plaintiff in Toledo, Dr. Isaacs has not alleged a physical or mental impairment. He justifies his decision not to do so this way:

> As an accomplished student, and businessman, Plaintiff does not wish to exacerbate his situation any further by publicly explicating his disability. If the Defense doubts he has overcome disability to achieve his academic and professional successes, it can be explored in discovery and dealt with in a strictly confidential and sealed manner. Certainly the law

---

[8] In addition, the ADA considers a person to be disabled if he has a record of having an impairment that substantially limits a major life activity, see 42 U.S.C. § 12102(1)(B), or if he is regarded as having such an impairment, see § 12102(1)(C).

App. 89

does not require the publication of one's med-
ical records to plead a claim.

FAC (doc. no. 40) ¶ 79 n.5. Notwithstanding plaintiff's
argument to the contrary, the nature of his purported
disability <u>is</u> something the Board has a right to learn
from his complaint, not something the Board can be
forced to explore in discovery. <u>See</u> Fed. R. Civ. P. 8(a)(2);
<u>Ashcroft</u>, 556 U.S. at 678.

In his objection to the Board's motion to dismiss,
plaintiff goes one step further; after offering to provide
medical records to the court, under seal, for in camera
review, he argues that dismissal of Count III under
Rule 12(b)(6) "in and of itself would appear to be a vio-
lation of Title II by depriving a disabled individual the
ability to participate in the civil resolution of and ad-
judication of disputes absent a public flogging on the
nature and extent of their disability." Pl.'s Obj. (doc. no.
37) 20. Plaintiff provides no legal authority for that
proposition, and the court declines to rule that it is re-
quired, by Title II of the ADA, to waive the <u>Iqbal</u> plead-
ing requirements as a reasonable accommodation for
an undisclosed disability.

In short, because he has not adequately alleged
that he has a disabling physical or mental impairment,
plaintiff has failed to state a cognizable claim for ADA
discrimination.[9]

---

[9] Given Dr. Isaacs's February 5 e-mail, in which he at-
tributed his inability to attend his hearing to the weather be-
tween Philadelphia and New Hampshire, it is also far from clear

App. 90

The Board also argues that plaintiff has not adequately alleged that he requested an accommodation. Plaintiff responds by arguing that requesting an accommodation is not an element of a Title II claim and that, in any event, he did request an accommodation in the form of remote participation in his hearing before the Board. The court does not agree.

With respect to the issue of requesting an accommodation, the court of appeals for this circuit has explained:

> In cases where the alleged violation involves the denial of a reasonable modification/ accommodation, "the ADA's reasonable accommodation requirement usually does not apply unless 'triggered by a request.'" Reed v. LePage Bakeries, Inc., 244 F.3d 254, 261 (1st Cir. 2001) (discussing the request requirement in the Title I context). This is because a person's "disability and concomitant need for accommodation are not always known . . . until the [person] requests an accommodation." Id. However, "sometimes the [person]'s need for an accommodation will be obvious; and in such cases, different rules may apply." Id. at 261 n.7.

Kiman v. N.H. Dep't of Corr., 451 F.3d 274, 283 (1st Cir. 2006) (footnote omitted). Moreover, "[r]equests for reasonable accommodations must be express and specific, must provide an agency with notice of the need for an

_____

that he has alleged a substantial limitation on a major life activity.

App. 91

accommodation, and must link the need to a disability."
Phillips v. Toumpas, No. 10-cv-588-JL, 2011 WL
3665381, at *3 (D.N.H. June 30, 2011) (citing Orta-
Castro v. Merck, Sharp & Dohme Química P.R., Inc.,
447 F.3d 105, 113 (1st Cir. 2006); Reed, 244 F.3d at
261)), R. & R. adopted by 2011 WL 3665330 (Aug. 19,
2011).

To begin, a request for an accommodation is a re-
quirement for relief on a failure to accommodate claim,
see Kiman, 451 F.3d at 283, and the exception for an
obvious need for accommodation does not apply here,
given plaintiff's own statement that "[n]ot all disabili-
ties [including, presumably, his own purported disabil-
ity] manifest themselves in an obvious physical way,"
Pl.'s Obj. (doc. no. 37) ¶ 20. As for allegations that he
met the request requirement, plaintiff directs the court
to paragraphs 77 through 82 of his FAC. While plaintiff
alleges that he was "denied the common courtesy of a
new hearing date in a snow storm," FAC ¶ 79, and re-
fers to the Board's "failure to recognize that [he]
needed a continuance for 'medical reasons,' " FAC ¶ 81,
paragraphs 77 through 82 are bereft of any actual al-
legation that Dr. Isaacs requested an accommodation
from the Board.

But, construing the complaint as favorably to
plaintiff as possible, the court presumes that plaintiff's
reference to the snow storm is an allegation that his
February 5 e-mail satisfied the request requirement
and that his reference to a continuance for medical rea-
sons is an allegation that his January 29 e-mail satis-
fied the request requirement.

App. 92

In his January 29 e-mail, Dr. Isaacs began by stating: "You have noticed a February 5th hearing, which I Hereby motion to stay, pending federal litigation in the Pennsylvania District Court." Compl., Ex. R (doc. no. 3-18), at 1. He continued:

> While this resolves in the US district court, I would hope the NH Board can defer to the legal authority of the federal judiciary system and postpone my hearing. This is a question of law, rather than any matter requiring additional evidence, and Chief Judge Tucker is in the appropriate position to determine matters of law.

> Furthermore, I am unable to drive to NH for medical reasons right now. I have conducted the last 3 depositions via skype for the USDC lawsuit. If the NH Board denies this request for a stay, I request to appear by telephone or video conference.

_Id._ Dr. Isaacs's cryptic reference to "medical reasons" is far from specific, which is a problem. See Reed, 244 F.3d at 261 ("[t]he employee's request must be 'sufficiently direct and specific'") (quoting Wynne v. Tufts Univ. Sch. of Med., 976 F.2d 791, 795 (1st Cir. 1992); citing Nathanson v. Med. Coll. of Pa., 926 F.2d 1368, 1381 (3d Cir. 1991)). And given that a bare reference to "medical reasons" does not satisfy the statutory definition of disability, see 42 U.S.C. § 12102(1), Dr. Isaacs's e-mail did not satisfy the request requirement because it did not "explain how the accommodation requested is linked to some disability," Reed, 244 F.3d at 261. In

App. 93

short, to the extent that Dr. Isaacs relies upon his January 29 e-mail to satisfy the request requirement, his reliance is misplaced; whatever else that e-mail may have been, it was not a request for an accommodation for a disability for the purposes of a Title II ADA claim.

Even less needs be said about the February 5 e-mail, in which Dr. Isaacs wrote:

> Due to the inclement weather between myself and New Hampshire, including snow, sleet and dangerous driving conditions around Boston and New York, I am not able to attend today's scheduled hearing. I currently have a rental car as my car is in the shop, and this car is particularly unequipped to drive in poor weather.

FAC ¶ 29. On the morning of his hearing, Dr. Isaacs ascribed his inability to attend to bad weather and a sub-standard rental car, but said nothing about any physical or mental impairment that precluded him from getting to New Hampshire. Taking that e-mail at face value, it would appear that the "medical reasons" that concerned Dr. Isaacs on January 29 had abated to the point where, on February 5, he was prepared to drive to New Hampshire so long as his rental car was up to it. Thus, if he had asked for an accommodation on February 5, which he did not, it would have been an accommodation for his lack of a weather worthy vehicle, not an accommodation for a disability. In short, the February 5 e-mail does not satisfy the reasonable accommodation request requirement.

App. 94

To sum up, because plaintiff's request for an order deleting, retracting or removing the Board's decision is barred by the <u>Rooker-Feldman</u> doctrine, the court lacks subject matter jurisdiction over it. And, as for any part of plaintiff's ADA discrimination claim over which the court has subject matter jurisdiction, plaintiff has failed to state a claim upon which relief can be granted. Accordingly, the Board is entitled to dismissal of Count III.

That dismissal, in turn, is with prejudice. Dismissal with prejudice as to plaintiff's request for injunctive relief is appropriate, as there is no way plaintiff could amend his complaint to overcome the <u>Rooker-Feldman</u> problem created by his request for an order directing the Board to retract its decision. As for the remainder of Count III, if the only problem were plaintiff's failure to allege a disability, then dismissal without prejudice would be appropriate as to the part of his claim that is not subject to dismissal on <u>Rooker-Feldman</u> grounds, to give plaintiff an opportunity to reconsider his reluctance to identify his disability. However, Count III suffers from a further fatal flaw: plaintiff has failed to allege a legally sufficient request for an accommodation. When all inferences from the FAC are drawn in plaintiff's favor, the complaint alleges that he requested an accommodation in the January 29 e-mail and/or the February 5 e-mail. Both are before the court in their entirety.[10] Given the

---

[10] Plaintiff attached the January 29 e-mail to his original complaint, and he quoted the February 5 e-mail, in full, in his FAC. Moreover, because the January 29 e-mail was attached to a

App. 95

inadequacy of those e-mails, there is nothing that plaintiff could possibly allege in an amended complaint that would cure his failure to plead facts sufficient to satisfy the request requirement. Accordingly, Count III is dismissed with prejudice.

## C.   Count IV: ADA Retaliation

In Count IV, plaintiff asserts a claim against the Board under Title V of the ADA, which provides, in pertinent part:

> No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter.

> It shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by this chapter.

---

complaint, it is properly before the court. See Foley, 772 F.3d at 71-72 (explaining that when considering Rule 12(b)(6) motions, courts generally limit their review to "the complaint, documents attached to it, and documents expressly incorporated into it").

App. 96

42 U.S.C. § 12203(a) & (b). As for the elements of the claim plaintiff asserts in Count IV:

> To make out a prima facie case of retaliation under [42 U.S.C. § 12203] a plaintiff must show that (1) he or she engaged in protected conduct, (2) he or she was subjected to an adverse action by the defendant, and (3) there was a causal connection between the protected conduct and the adverse action. See Carreras v. Sajo, García & Partners, 596 F.3d 25, 35 (1st Cir. 2010); Reinhardt [v. Albuquerque Pub. Sch. Bd. of Ed.], 595 F.3d [1126,] 1131 [(10th Cir. 2010)]; Quiles-Quiles v. Henderson, 439 F.3d 1, 8 (1st Cir. 2006). Once a plaintiff makes such a showing, the burden shifts to the defendant to articulate a legitimate, non-retaliatory explanation for the adverse action. See Carreras, 596 F.3d at 36. If the defendant does so, the burden shifts back to the plaintiff to show that the proffered legitimate explanation is pretextual, meaning that the defendant was motivated by a retaliatory animus. See id.

D.B. ex rel. Elizabeth B. v. Esposito, 675 F.3d 26, 41 (1st Cir. 2012).

As with Count III, the Board argues that it is entitled to dismissal of Count IV because the court lacks subject matter jurisdiction over the claim asserted therein, and because plaintiff has failed to state a claim upon which relief can be granted. Given that the relief plaintiff seeks for the claim he asserts in Count IV is the same relief he seeks for the claim he asserts

App. 97

in Count III, the discussion of subject matter jurisdiction that pertains to Count III applies with equal force to Count IV. Thus, to the extent that the claim plaintiff asserts in Count IV is a request for equitable relief, the court lacks subject matter jurisdiction over it. Turning to the part of Count IV that is not barred by the Rooker-Feldman doctrine, plaintiff has failed to make out a prima facie case of ADA retaliation.

The court begins by describing Count IV. Plaintiff alleges the following protected conduct: (1) "[a]sserting his ADA rights with Dartmouth," FAC ¶ 85(a); (2) "[a]sserting his ADA rights with the Board," FAC ¶ 85(b); and (3) "[s]eeking access to justice and the fair administration of [j]ustice at the Board," FAC ¶ 85(c). Then he alleges the following adverse actions: (1) "using confidential and sealed information as 'evidence,' " FAC ¶ 86; (2) "ignoring other information," id.; and (3) "denying reasonable accommodation[] requests," id. After identifying the protected conduct and adverse actions on which he bases his claim, plaintiff continues with this allegation:

> Upon information and belief, neither Dartmouth nor the Board of [M]edicine want any disabled individuals to become [d]octors. Such a policy is against the law and Plaintiff has been severely harmed by these illegal practices and retaliation in violation of the ADA.

FAC ¶ 87. The remainder of Count IV consist of three quotations from 42 U.S.C. § 12203, and this summation:

App. 98

> The Board retaliated against or coerced, in-
> timidated, threatened, or interfered with Dr.
> Isaacs due to his claims and failed claims for
> relief under the ADA.

FAC ¶ 91.

The Board argues that plaintiff has "fail[ed] to
provide sufficient, non-conclusory facts to support a re-
taliation claim." The court agrees.

Turning to the first element of his claim, plaintiff
makes two allegations that he asserted his ADA rights
and one allegation that he sought access to justice. But
he says nothing about how he did those things, which
means that his purported allegations are nothing more
than bare legal conclusions, which are insufficient to
survive a motion to dismiss. See Privitera v. Curren (In
re Curren), 855 F.3d 19, 25 (1st Cir. 2017). However,
even if the court were to fill in the blanks for plaintiff,
he has failed to adequately allege the first element of
his claim.

With respect to asserting his ADA rights with
Dartmouth, plaintiff alleges no specific conduct, but
may be referring to the ADA claim he asserted against
DHMC in 12-cv-40-LM. If so, there is a rather large
causation problem; plaintiff makes no allegations that
would plausibly link protected conduct directed toward
DHMC with alleged retaliation by the Board, which is
the defendant in Count IV.

With respect to asserting his ADA rights with the
Board, plaintiff alleges no specific conduct, but based

App. 99

upon factual allegations elsewhere in his complaint, he can only be referring to his purported assertion of a right, under the ADA, to a reasonable accommodation. But, for reasons explained in the previous section, plaintiff has failed to adequately allege that he ever made a bona fide request for an accommodation for the purposes of an ADA discrimination claim. Thus, as to that form of protected conduct, he has failed to make allegations that satisfy the first element of an ADA retaliation claim.

Finally, plaintiff's third allegation of protected conduct, "seeking access to justice," is too vague to discern its meaning. Moreover, Title II of the ADA is not about providing access to justice; it is about providing disabled persons with access to public services. However, if by "seeking access to justice," plaintiff is referring to an attempt to participate in his hearing before the Board, the court can discern no difference between the conduct underlying plaintiff's third allegation and the conduct underlying his second allegation. Accordingly, plaintiff's third allegation also falls short of alleging facts that would establish the first element of an ADA retaliation claim.

Plaintiff's attempt to make allegations to support the second element of his claim are equally unavailing. In light of the Rooker-Feldman doctrine, the court lacks subject matter jurisdiction to consider a claim that would require it to evaluate the manner in which the Board handled the evidence before it when adjudicating plaintiff's case. Thus, the first two forms of adverse action plaintiff alleges cannot form the basis for

App. 100

a cognizable ADA retaliation claim. As for the third form of adverse action, denying plaintiff's request(s) for a reasonable accommodation, the court has already ruled that plaintiff has not adequately alleged that the Board denied any such request.

In sum, plaintiff has failed to adequately allege facts to support either of the first two elements of his ADA retaliation claim. Accordingly, the Board is entitled to dismissal of Count IV. And, given that the specific pleading deficiencies that entitle the Board to dismissal of Count IV are not amenable to correction in an amended complaint, for reasons that the court has already explained in its discussion of Count III, Count IV is dismissed with prejudice.

### D.   Count V: Prospective Injunctive Relief

Count V is captioned "Prospective Injunctive Relief against the NH Board of Medicine in its Official Capacity," and it concludes in the following way:

> The plaintiff is seeking injunctive and declaratory relief against the State, or the "office" of the NH Board of Medicine to take down and/or retract the Constitutionally infirm March 11, 2014 Decision against the Plaintiff.

FAC ¶ 99. The Board argues that dismissal of Counts III and IV necessarily entitles it to dismissal of Count V. The court agrees.

Injunctive relief is not a cause of action; it is a remedy. But, as the court has already explained, it could

App. 101

not award the particular form of injunctive relief that
plaintiff seeks in Count V without running afoul of the
Rooker-Feldman doctrine. Moreover, in paragraph 99,
plaintiff appears to suggest that he is entitled to the
injunctive relief he seeks as a remedy for a constitu-
tional violation, but he has no constitutional claim
against the Board. For those reasons, and principally
because Count V does not assert a cause of action in
the first instance, the Board is entitled to dismissal of
Count V, with prejudice.

### E.   Count I: Denial of Due Process

In Count I, plaintiff uses the vehicle of 42 U.S.C.
§ 1983 to assert a claim that Attorney Cahill, Penny
Taylor, and the individual members of the Board vio-
lated his rights to substantive and procedural due pro-
cess under the U.S. Constitution. For that purported
constitutional violation, he seeks "monetary relief to be
made whole, or, the retraction, withdrawal, and elimi-
nation from the public domain of the Board's Order."
FAC ¶ 66.

In a footnote in its motion to dismiss, the Board
urges the court, in the interest of judicial economy, to
dismiss Count I sua sponte. The board argues that dis-
missal is appropriate because: (1) Count I is time-
barred; (2) all the defendants against whom plaintiff
plans to assert Count I are absolutely immune from li-
ability; and (3) plaintiff seeks relief in Count I that is
not legally available from the individuals against
whom he proposes to assert his § 1983 claim. Plaintiff

acknowledges the Board's suggestion, but asks the court to disregard it, citing <u>Keegel v. Key West Caribbean Trading Company</u> for the proposition that "courts . . . universally favor trial on the merits," 627 F.2d 372, 375 (D.C. Cir. 1980) (quoting <u>Bridoux v. E. Air Lines, Inc.</u>, 214 F.2d 207, 210 (D.C. Cir. 1954)) (internal quotation marks omitted). He continues:

> [I]t would be patently unfair and unjust to summarily dismiss the Plaintiff's claim under § 1983 at this early stage when no salient argument for dismissal has been presented and the standard of review at this stage requires a light most favorable to the Plaintiff. Therefore, Count I should stand.

Pl.'s Obj. (doc. no. 37) ¶ 10.

The court shares both the Board's concern about the timeliness of the claim in Count I and plaintiff's concern that that <u>sua</u> <u>sponte</u> dismissal might be precipitous. "Sua sponte dismissals are strong medicine, and should be dispensed sparingly." <u>Garayalde-Rijos</u>, 747 F.3d at 22. But, at the same time, allowing plaintiff to serve a claim that is plainly time barred would be pointless and would lead to an inefficient use of judicial resources. Moreover, if the claim in Count I is timely, there is nothing to prevent plaintiff from demonstrating that right now.[11] Therefore, in an attempt to

---

[11] Indeed, in its objection to plaintiff's motion to amend his original complaint, the Board argued that Count I is time barred, and plaintiff responded, going so far as to argue that if he did file Count I outside the limitations period, he was entitled to the benefit of equitable tolling. <u>See</u> Pl.'s Reply (doc. no. 24) ¶¶ 11-25.

App. 103

balance all of those competing interests and out of an abundance of caution, the court declines the Board's invitation to dismiss Count I <u>sua</u> <u>sponte</u>, but rather than allowing plaintiff to serve Attorney Cahill, Penny Taylor, and the individual members of the Board, the court charts a middle course: plaintiff is hereby ordered to show cause why Count I should not be dismissed as untimely. To guide plaintiff's show cause briefing, the court will devote the balance of this section to outlining the legal principles that will inform the court's consideration of the issue at hand. In addition, because this issue has already been briefed to some extent, the court will offer its impressions of the relevant issues based upon the arguments that plaintiff has already made.

"Because section 1983 does not have its own statute of limitations . . . courts use the personal-injury limitations period adopted by the state where the injury supposedly occurred." <u>Martínez-Rivera v. Puerto Rico</u>, 812 F.3d 69, 74 (1st Cir. 2016) (citing <u>Morris v. Gov't Dev. Bank of P.R.</u>, 27 F.3d 746, 748 (1st Cir. 1994)). In New Hampshire,

> all personal actions, except actions for slander or libel, may be brought only within 3 years of the act or omission complained of, except that when the injury and its causal relationship to the act or omission were not discovered and could not reasonably have been discovered at the time of the act or omission, the action shall be commenced within 3 years of the time the plaintiff discovers, or in the exercise of reasonable diligence should have discovered,

App. 104

the injury and its causal relationship to the
act or omission complained of.

RSA 508:4.

In Count I, plaintiff claims that defendants denied
him both substantive and procedural due process, in
six different ways, when conducting his hearing. See
FAC ¶ 52. His claim appears to have accrued no later
than March 11, 2014, the date on which the Board is-
sued its Order, which identified Attorney Cahill as the
Board's hearing counsel and which was signed by
Penny Taylor. Plaintiff first asserted his § 1983 claim
against Attorney Cahill, Taylor, and the individual
members of the Board in his FAC, which was filed on
May 1, 2017, approximately six weeks after the limita-
tions period had run. Consequently, the claim plaintiff
asserts in Count I appears to be time-barred.

Plaintiff, however, has argued that "[t]he legal
princip[le] of equitable tolling would operate in re-
gards to the relation-back doctrine to extend the stat-
ute of limitations in this instance where the [original]
Complaint was timely filed." Pl.'s Reply (doc. no. 24) 6.

In § 1983 cases, federal courts "borrow the state's
tolling rulings – unless of course they are hostile to fed-
eral interests," Martínez-Rivera, 812 F.3d at 75 (citing
Rodríguez v. Mun. of San Juan, 659 F.3d 168, 173 (1st
Cir. 2011); López-González v. Mun. of Comerío, 404 F.3d
548, 552 (1st Cir. 2005)). New Hampshire has em-
braced the doctrine of equitable tolling, which the state
supreme court has described this way:

App. 105

> Equitable tolling allows a party "to initiate an
> action beyond the statute of limitations dead-
> line," but "is typically available only if the
> claimant was prevented in some extraordi-
> nary way from exercising his or her rights."
> Portsmouth Country Club v. Town of Green-
> land, 152 N.H. 617, 623 (2005) (quotation
> omitted). Equitable tolling "applies princi-
> pally if the plaintiff is actively misled by the
> defendant about the cause of action." Id. (quo-
> tation omitted).

Kierstead v. State Farm Fire & Cas. Co., 160 N.H. 681,
688 (2010) (parallel citation omitted). Here, plaintiff
did not argue that he was prevented from exercising
his rights in any extraordinary way, or that any de-
fendant or potential defendant misled him about the
cause of action. To the contrary, in his motion to amend,
he explained that he was asserting claims against At-
torney Cahill and Taylor in his FAC "in response to the
Board's claims of immunity." Pl.'s Mot. to Amend (doc.
no. 14) ¶ 9. And in his reply to the Board's objection to
his motion to amend, attributed his decision not to
name Attorney Cahill and Taylor as defendants to his
"mistake in attempting to be civil and not name indi-
viduals as defendants." Pl.'s Reply (doc. no. 24) ¶ 17.
Because plaintiff does not identify any way in which he
was prevented from filing a timely § 1983 claim
against the defendants named in Count I of his FAC,
he does not appear to be entitled to the benefit of equi-
table tolling.

Plaintiff's reference to the relation-back doctrine
seems to be equally unavailing. In Perez v. Pike

App. 106

Industries, Inc., "the plaintiff allegedly injured his ankle when his foot sank into a patch of soft pavement on the edge of the highway," 153 N.H. 158, 159 (2005). Then,

> the plaintiff brought negligence claims against the State of New Hampshire, the Commissioner of the New Hampshire Department of Transportation, and the New Hampshire Department of Transportation (DOT), alleging his injury "was caused by the failure of defendant State of New Hampshire, through the agents, servants, and employees of the Department of Transportation to exercise due care and proper workmanship in the paving and patching of the area at the edge of the road."

Id. After the limitations period had run,

> the plaintiff moved to add Pike as a party defendant, alleging "[d]iscovery has revealed that Pike Industries held a subcontract with the state for maintenance of the roadway in question, and therefore may be liable for the condition of the roadway and in particular the paving at the time of the Plaintiff's injury."

Id. Pike moved to dismiss, arguing that the plaintiff's claim was time barred. See id. The trial court dismissed the plaintiff's claim against Pike, see id., and the plaintiff appealed.

On appeal, the plaintiff made two arguments, one of which is relevant here: he argued that "his initial writ named Pike as a party by its reference to the

App. 107

'agents, servants, and employees' of the State." <u>Id.</u> at 160. In rejecting the plaintiff's argument, the supreme court

> recognized that [its] policy of liberally allowing amendment permits the addition of a party in the case of misnomer, which involves the misdescription of a properly served party, whereas it does not generally permit the addition of an entirely new party in cases involving mistaken identity, where the wrong party had been brought before the court.

<u>Id.</u> at 162 (citing <u>Dupuis v. Smith</u>, 114 N.H. 625, 628 (1974)).

Here, plaintiff has not argued that substituting the individuals named as defendants in Count I of the FAC for the defendant named in Count I of his original complaint was an attempt to correct a misnomer in the original complaint. Rather, his own pleadings demonstrate that his addition of those individuals was either an attempt to correct a legal misunderstanding that was brought to his attention by the Board's objection to his motion to amend or was an attempt to correct his misguided act of civility. Either way, based upon <u>Perez</u>, it seems evident that if it were presented with the facts of this case, the New Hampshire Supreme Court would rule that plaintiff's claims against the individuals named in Count I of the FAC do not relate back to the original complaint in a way that would provide plaintiff with relief from the statute of limitations.

App. 108

Based upon the foregoing, it appears that the claims that plaintiff asserts in Count I are time barred. But in the interest of giving plaintiff a full and fair opportunity to litigate those claims, he will be given an opportunity to show cause why Count I should not be dismissed as time barred, for the reasons outlined above.

### III.   Conclusion

To summarize: (1) the Trustees' motion to dismiss Count VIII, document no. 36, is granted with prejudice, except for plaintiff's claim that the Trustees and/or DHMC retaliated against him for pursuing 12-cv-40-LM by rejecting his 2016 application for a residency, which is dismissed without prejudice; (2) the Board's motion to dismiss Counts III, IV, and V, document no. 35, is granted with prejudice, in its entirety; and (3) plaintiff is ordered to show cause why Count I should not be dismissed as time barred.

As for the portion of Count VIII that is dismissed without prejudice, plaintiff has 20 days from the date of this order to file a motion for leave to amend his FAC to assert a properly exhausted ADA retaliation claim based upon his most recent rejection for a residency. If plaintiff files a motion for leave to amend, the customary deadlines for responding will apply. If he does not file such a motion, then Count VIII will be dismissed, with prejudice, in its entirety.

As for Count I, plaintiff has 20 days from the date of this order to show cause, in a separate filing, see LR

App. 109

7.1(a), why the § 1983 claim asserted therein should not be dismissed as time barred. If he fails to respond to the court's show cause order, or if he fails to show cause, Count I will be dismissed, for the reasons described above. However, if plaintiff is able to persuade the court that Count I is not time barred, then he shall have 60 days from the date of the court's favorable order on his show cause briefing to serve Attorney Cahill, Penny Taylor, and the individual members of the Board.

Finally, if plaintiff files neither a motion for leave to amend nor a response to the show cause order, then his FAC will be dismissed in its entirety, and the clerk of the court will be directed to close the case.

SO ORDERED.

/s/  [Illegible]
Landya McCafferty
United States District Judge

October 24, 2017

cc:  Pierre A. Chabot, Esq.
J.D. Isaacs, pro se
Edward M. Kaplan, Esq.
Kathleen C. Peahl, Esq.
Christopher James Pyles, Esq.

App. 110

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE

<u>Dr. Jeffrey Isaacs</u>

v.

<u>Trustees of Dartmouth
College, NH Board of
Medicine, and Dartmouth-
Hitchcock Medical Center</u>

Civil No. 17-cv-040-LM
Opinion No. 2017 DNH 136

## **ORDER**

Asserting claims that arise from a disciplinary action taken against him by the New Hampshire Board of Medicine ("Board"), Dr. Jeffrey Isaacs has sued the Board, the Trustees of Dartmouth College ("Trustees"), and Dartmouth-Hitchcock Medical Center ("DHMC").[1] Against DHMC (and the Trustees), plaintiff brings: (1) substantive and procedural due process claims, through the vehicle of 42 U.S.C. § 1983 (Count VI); (2) a claim under 42 U.S.C. § 1985(3) (Count VII); (3) a retaliation claim under the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101-12213 (Count VIII); and (4) a claim captioned "Injunctive Relief" (Count IX). Before the court is DHMC's motion to dismiss. Plaintiff objects. For the reasons that follow: (1) DHMC's motion to dismiss is granted as to Counts VI, VII, and IX; (2) Counts VI, VII, and IX are dismissed

---

[1] Plaintiff's First Amended Complaint, which is the operative complaint in this case, <u>see</u> doc. no. 33, names two additional defendants, Jeff Cahill, Esq. and Penny Taylor, who are affiliated with the Board. At this point, the docket gives no indication that either Cahill or Taylor has been served with the FAC.

App. 111

as to the Trustees, sua sponte; (3) plaintiff's § 1985(3) claim against the Board, asserted in Count II, is dismissed sua sponte; and (4) plaintiff is ordered to show cause why the ADA retaliation claims he asserts in Counts IV and VIII should not be dismissed, with prejudice, for failure to exhaust the administrative remedies available to him.

## I.   The Legal Standard

Under Rule 12(b)(6), the court must accept the factual allegations in the complaint as true, construe reasonable inferences in the plaintiff's favor, and "determine whether the factual allegations in the plaintiff's complaint set forth a plausible claim upon which relief may be granted." Foley v. Wells Fargo Bank, N.A., 772 F.3d 63, 71 (1st Cir. 2014) (citation omitted). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). Analyzing plausibility is "a context-specific task" in which the court relies on its "judicial experience and common sense." Id. at 679.

## II.   Background

The facts recited in this section are drawn from: (1) plaintiff's First Amended Complaint ("FAC"); (2) exhibits attached to plaintiff's original complaint; (3) other "documentation incorporated by reference in the complaint," Sanders v. Phoenix Ins. Co., 843 F.3d 37, 42 (1st

App. 112

Cir. 2016) (quoting <u>Rivera-Díaz v. Humana Ins. of P.R., Inc.</u>, 748 F.3d 387, 388 (1st Cir. 2014)); and (4) the summary judgment order in an action that plaintiff brought in 2012 against DHMC, the Trustees, and several other defendants.

Isaacs attended the Keck School of Medicine of the University of Southern California ("Keck" or "USC") until, during his first year, "he was suspended and ultimately dismissed for harassing a classmate." <u>Isaacs v. Dartmouth-Hitchcock Med. Ctr.</u>, No. 12-CV-040-LM, 2014 WL 1572559, at *2 (D.N.H. Apr. 18, 2014). Dr. Isaacs then sued USC, and his suit resulted in two settlement agreements, one with USC's deans and one with USC itself.

After he left USC, Isaacs attended the American University of the Caribbean, Netherlands Antilles, which awarded him an M.D. degree. Thereafter, he began a residency in general surgery at the University of Arizona ("UA"), but he resigned after approximately three weeks.

Next, Dr. Isaacs applied for a residency at DHMC through the Electronic Residency Application Service ("ERAS"). "In [his ERAS] application, he omitted both his attendance at USC and his aborted residency at UA." <u>Isaacs</u>, 2014 WL 1572559, at *2. Based upon his ERAS application, Dr. Isaacs was accepted into the DHMC residency program in psychiatry.

Dr. Isaacs began his DHMC residency in June of 2011. He was dismissed in March of 2012. DHMS's letter of dismissal states, in pertinent part:

App. 113

The decision to dismiss you from your position in the residency is based on academic deficiency issues as well as behavior incompatible with the role of a physician including the omission of material information from your Electronic Residency Application Service (ERAS) application, falsification of information provided to the New Hampshire Board of Medicine, and false reporting in a patient's electronic medical record as well as other substantiated competency and integrity concerns.

Specifically, your ERAS application lacked information regarding your prior residency training in Arizona as well as time served as a medical student at the University of Southern California. You also failed to divulge your dismissal from medical school at USC in information provided to the New Hampshire Board of Medicine in support of a NH training license.

Compl., Ex. K (doc. no. 3-11), at 1.

Before he was dismissed from the DHMC residency program in 2012, Dr. Isaacs had filed suit against four defendants, including DHMC and the Trustees. After his dismissal, he amended his complaint to add defendants and causes of action. In his amended complaint, he asserted multiple causes of action, under state and federal statutes, including the ADA, and under the common law of New Hampshire. The defendants in Dr. Isaacs' 2012 action all prevailed at summary judgment.

App. 114

After DHMC dismissed Dr. Isaacs, it notified the Board of his dismissal, and further informed the Board that Dr. Isaacs had "allegedly omitted material facts from his Application for Training License for Residents and Graduate Fellows and the supplement filed along with the application." Def.'s Mot. to Dismiss, Ex. 1 (doc. no. 7-1), at 1. "As a result of [that] information, the Board commenced an investigation to determine whether [Dr. Isaacs] committed professional misconduct pursuant to RSA 329:17, VI and RSA 329:18." Id.

In October of 2013, the Board issued a Notice of Hearing, informing Dr. Isaacs that a hearing had been scheduled for February 5, 2014. On January 29, 2014, Dr. Isaacs notified the Board that he had filed suit against it in Pennsylvania, and asked the Board to postpone his hearing. He also asked to appear at his hearing telephonically, for medical reasons. The Board denied both requests. On the morning of the day of his hearing, which was scheduled for 1:00 p.m., Dr. Isaacs sent the Board an e-mail indicating that he would not be attending, due to inclement weather that would make it impossible for him to drive to New Hampshire from Pennsylvania. The hearing went on as scheduled, without Dr. Isaacs. "Attorney Jeff Cahill appeared as hearing counsel." Def.'s Mot. to Dismiss, Ex. 1 (doc. no. 7-1), at 4.

About a month after the hearing, the Board issued a Final Decision and Order, which was signed by Penny Taylor, in her capacity as Administrator and Authorized Representative of the New Hampshire Board of Medicine. Taylor described the evidence before the

App. 115

Board as including the two e-mails in which Dr. Isaacs
had requested continuances of the hearing, and she
also characterized the three exhibits produced by hear-
ing counsel:

> Exhibit 1 is [Dr. Isaacs'] 2011 NH Application
> for Residency Training License; Exhibit 2 is
> an excerpt of a March 1, 2007 court order in
> Isaacs v. USC; and Exhibit 3 [is] the April
> 2008 Confidential Settlement in Isaacs v.
> USC. These exhibits along with notice of wit-
> nesses to be presented were provided to [Dr.
> Isaacs] on January 31, 2014.

> Hearing counsel also presented the testi-
> mony of Dori Lefevbre, Board Investigator.
> Ms. Lefevbre testified that she was able to
> obtain the documents that were marked as ex-
> hibits 2 and 3 as public records available on-
> line from the federal court system.

Def.'s Mot. to Dismiss, Ex. 1 (doc. no. 7-1), at 5. Accord-
ing to its order, the Board relied upon no exhibits other
than Dr. Isaacs' two e-mails, his ERAS application, and
the court order and settlement agreement that its in-
vestigator had obtained from the public record of Dr.
Isaacs' case against USC.

In its decision, the Board noted that DHMC's dis-
missal of Dr. Isaacs resulted in the cancellation of his
medical license as a matter of law. But, it also went on
to issue a reprimand, based upon its findings that
when Dr. Isaacs applied for his license, he "knowingly
made a false statement and further failed to disclose
a material fact." Def.'s Mot. to Dismiss, Ex. 1 (doc. no.

App. 116

7-1), at 8-9. Since the Board reprimanded him, Dr. Isaacs has applied to many residency programs, including the program at DHMC, but he has not received a single interview.[2]

On February 3, 2017, two days before the third anniversary of his hearing before the Board, Dr. Isaacs filed the complaint that initiated this action. His case now consists of five claims against the Board and four claims against DHMC and the Trustees, which plaintiff lumps together as the "Dartmouth Defendants."[3]

### III.  Discussion

In its motion to dismiss, DHMC argues that all four of plaintiff's claims against it are barred by res judicata. It also argues, in the alternative, that even if res judicata does not bar those claims, they are each individually subject to dismissal under Rule 12(b)(6). In the discussion that follows, the court considers each of plaintiff's claims individually.

---

[2]  DHMH rejected applications from Dr. Isaacs in 2013, 2014, 2015, and 2016. The FAC, however, does not provide specific dates for those rejections.

[3]  In his objection to a motion to dismiss filed by the Trustees, plaintiff had this to say about those two defendants: "The Trustees vs. Dartmouth-Hitchcock distinction is confusing and hopefully through discovery and stipulation we can narrow this down to name the appropriate party or parties with more precision and clarity." Doc. no. 16, at 4 n.3.

App. 117

## A.  Count VI

In Count VI of his FAC, plaintiff claims that DHMC violated his constitutional rights to both substantive and procedural due process by participating in the disciplinary action that resulted in the reprimand he received from the Board. He frames his claim this way:

> Agents of Dartmouth acting under color of State law, as actors, or as willful participants in a joint activity with Atty. Cahill, Penny Taylor and the other Board members, under color of the authority vested in them by State law, went above and beyond or outside the scope of their job duties and descriptions by taking the actions and inactions described herein. To wit-
>
> a.  Employing <u>confidential</u> out of state and inaccurate settlement documents to [d]eprive Dr. Isaacs of his livelihood and publicly embarrass him;
>
> b.  Failing to consider the relevant documents provided by Dr. Isaacs in his defense;
>
> c.  Failing to honor the solemnity of a confidential Court Settlement Agreement;
>
> d.  Failing to honor Dr. Isaacs' reasonable request to continue the hearing for medical reasons;
>
> e.  Failing to honor Dr. Isaacs' reasonable request to continue the hearing for inclement weather;

App. 118

f.   Failure to allow Dr. Isaacs' reasonable re-
     quest to participate electronically.

FAC (doc. no. 14-1) ¶ 111 (emphasis in the original). As
relief for the claims he asserts in Count VI, plaintiff
"seeks monetary relief to be made whole, or, the retrac-
tion, withdrawal, and elimination from the public do-
main of the Board's Order." FAC ¶ 117.

    As a preliminary matter, it is necessary to identify
the specific conduct by DHMC on which plaintiff bases
the § 1983 claim he asserts in Count VI. Without doing
so, the court would be unable to address DHMC's ar-
gument that Count VI should be dismissed because
plaintiff has failed to allege any conduct on its part
that was undertaken under color of state law, which is
a necessary element of any claim brought by means of
42 U.S.C. § 1983. See Miller v. Town of Wenham, 833
F.3d 46, 51 (1st Cir. 2016) (citing Chongris v. Bd. of Ap-
peals, 811 F.2d 36, 40 (1st Cir. 1987)).

    There is a good argument to be made that Count
VI alleges no conduct at all by DHMC. For one thing,
the list of "actions and inactions" described in para-
graph 111 of the FAC is identical to the list of "actions
and inactions" described in paragraph 52, which sup-
ports Count I, plaintiff's § 1983 claim against Jeff Ca-
hill and the individual members of the Board. In a
similar vein, the equitable relief plaintiff seeks in
Count VI, i.e., removal of the Board's March 11, 2014,
order from the public domain, see FAC ¶ 117, is not
something DHMC could possibly provide. Thus, it ap-
pears that Count VI is nothing more than plaintiff's

§ 1983 claim against members of the Board with DHMC's name attached to it. Be that as it may, the court must construe the complaint favorably to plaintiff, see Foley, 772 F.3d at 71, and in the interest of so doing, it will examine each of the subparagraphs in paragraph 111 individually, to determine whether any of them may reasonably be construed as alleging conduct by DHMC.

Based upon the factual allegations elsewhere in plaintiff's complaint, at least four of the six subparagraphs may not reasonably be construed as alleging conduct by DHMC. First, given that plaintiff alleges that he provided a key document to Atty. Cahill, i.e., one of the two settlement agreements from his case against USC, and that Cahill "failed to provide the agreement to the Board or its investigator," FAC ¶ 40, and given that the only "defense" that Dr. Isaacs has mounted was to the charge of professional misconduct that was adjudicated by the Board, plaintiff has not alleged that DHMC "[f]ail[ed] to consider the relevant documents provided by Dr. Isaacs in his defense," FAC ¶ 111(b).[4] Second, given plaintiff's allegations that the Board conducted the February 5, 2014, hearing, and

_____

[4] If, however, plaintiff is alleging that DHMC failed to consider relevant documents during the process that led to his dismissal, any claim based upon such an allegation would be untimely, given that DHMC dismissed him in 2012. See Coleman v. New Hampshire, No. 16-cv-498-LM, 2017 WL 1968676, at *2 (D.N.H. Apr. 18, 2017) (citing Gorelik v. Costin, 605 F.3d 118, 121 (1st Cir. 2010)) ("The statute of limitations for § 1983 claims arising out of events occurring in New Hampshire is three years."), R & R adopted by 2017 WL 1968647 (May 10, 2017).

App. 120

that he asked the Board to continue that hearing, he has not alleged that <u>DHMC</u> failed to: (1) "honor [his] reasonable request to continue the hearing for medical reasons," FAC ¶ 111(d); (2) "honor [his] reasonable request to continue the hearing for inclement weather," FAC ¶ 111(e); or (3) "allow [his] reasonable request to participate [in his hearing] electronically," FAC ¶ 111(f). Thus, the only allegations in paragraph 111 that might possibly pertain to DHMC are those described in sub-paragraphs (a) and (c).

In subparagraph (a), plaintiff alleges that DHMC "[e]mploy[ed] <u>confidential</u> out of state and inaccurate settlement documents to [d]eprive [him] of his livelihood and publically embarrass him" (emphasis in the original). The FAC does not, however, allege what documents DHMC employed, or how DHMC employed them, deprived him of his livelihood, or publically embarrassed him. In subparagraph (c), plaintiff alleges that DHMC "[f]ail[ed] to honor the solemnity of a confidential Court Settlement Agreement." While subparagraph (c) is a bit opaque, this appears to be the gist of it:

> It is claimed that the Board's investigator allegedly obtained records from PACER. Plaintiff believes Dr. Finn, or another Dartmouth agent provided sealed and/or confidential records. It was wholly improper for Dr. Finn to provide these records, even those publically available on PACER, to the Board in the absence of any explanation as to the reason they were sealed or any related circumstances.

App. 121

FAC ¶ 34. While it is far from clear that the allegations in subparagraphs (a) and (c) are sufficient to pass muster under Iqbal, 556 U.S. at 677-80, they suffer from an antecedent problem, identified by DHMC, to which the court now turns. That problem is plaintiff's failure to adequately allege that the acts he complains of, i.e., "[e]mploying . . . settlement documents," FAC ¶ 111(a), and "[f]ailing to honor the solemnity of a confidential Court Settlement Agreement," FAC ¶ 111(c), were committed under color of state law.

Plaintiff brings Count VI through the vehicle of 42 U.S.C. § 1983. To prevail on a § 1983 claim, a plaintiff "must show: (1) that the complained-of conduct was committed under the color of state law, and (2) that such conduct violated his constitutional or federal statutory rights." Miller, 833 F.3d at 51.

In his complaint, plaintiff describes DHMC as a private entity, specifically "a non-profit corporation." FAC ¶ 12. However, "§ 1983 does not apply to merely private conduct, no matter how discriminatory or wrongful." Grapentine v. Pawtucket Credit Union, 755 F.3d 29, 31 (1st Cir. 2014) (internal quotation marks omitted) (quoting Am. Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 50 (1999); citing Blum v. Yaretsky, 457 U.S. 991, 1002 (1982)). On the other hand, "a private party can be fairly characterized as a state actor if the circumstances of the case meet one of three tests: the public function test, the joint action/nexus test, or the state compulsion test." Grapentine, 755 F.3d at 32 (quoting Alberto San, Inc. v. Consejo de Titulares del Condo. San Alberto, 522 F.3d 1, 4 (1st Cir. 2008)). That said, "[i]t is

App. 122

only in rare circumstances that private parties can be viewed as state actors." Estades-Negroni v. CPC Hosp. San Juan Capestrano, 412 F.3d 1, 4 (1st Cir. 2005) (internal quotation marks and brackets omitted) (quoting Harvey v. Harvey, 949 F.2d 1127, 1130 (11th Cir. 1992)).

Plaintiff asserts that DHMC is a state actor under the public function test and the joint action/nexus test. On this issue, he bears the burden of proof. See Grapentine, 755 F.3d at 32 (citing Mead v. Independence Ass'n, 684 F.3d 226, 231 (1st Cir. 2012)). He has failed to carry that burden.

"The public function [test] is designed to flush out a State's attempt to evade its responsibilities by delegating them to private entities." Grapentine, 755 F.3d at 32 (quoting Perkins v. Londonderry Basketball Club, 196 F.3d 13, 18-19 (1st Cir. 1999)). Here, the public function at issue is the licensure and discipline of physicians. Nowhere does plaintiff allege that the State of New Hampshire delegated that responsibility to DHMC. Rather, he alleges that the Board conducted an investigation into whether he had committed professional misconduct, and determined that he had. As for DHMC, he merely alleges that DHMC referred him to the Board and provided the Board with several pieces of evidence. Suffice it to say that DHMC's interaction with a state agency performing a public function falls far short of establishing that DHNC engaged in state action by performing a public function that had been delegated to it by the State of New Hampshire. Thus, plaintiff has failed to show that if DHMC employed

App. 123

any confidential court documents or dishonored the sanctity of a confidential settlement agreement in the first instance, it did either of those things under color of state law.

While plaintiff identifies "joint action" and "nexus" as two separate tests in his FAC, <u>Grapentine</u> uses those terms to describe a single test, and this court follows suit. "Under the nexus or joint action test, state action may be found where the government has 'so far insinuated itself into a position of interdependence with the [private actor] that it was a joint participant in the enterprise.'" <u>Bass v. Parkwood Hosp.</u>, 180 F.3d 234, 242 (5th Cir. 1999) (quoting <u>Jackson v. Metro. Edison Co.</u>, 419 U.S. 345, 357-58 (1974)); <u>see also</u> <u>Estades-Negroni, 412 F.3d at 5 (relying on Bass</u>). Here, the "enterprises" at issue are the employment of confidential documents and the dishonoring of a confidential settlement agreement. <u>See</u> FAC ¶¶ 111(a) & (c).

Plaintiff has failed to allege that the government insinuated itself into a position of interdependence with DHMC with respect to the acquisition, dissemination, or use of documents generated by or referred to in Isaacs' suit against USC. Rather, he alleges "that Agents of the Dartmouth Defendants dug up, by legal or illegal means, and disseminated to the Board, confidential and sealed documents." FAC ¶ 105. He does not allege that DHMC did so in conjunction with the Board or any other arm of the State; he merely alleges that once DHMC acquired the documents at issue, the Board received them. Those are two sequential actions, not a joint action. That view of events is reinforced by

App. 124

an excerpt from a deposition that plaintiff attached to his complaint. In that deposition, Dr. Christine Finn, the director of DHMC's adult psychiatry training program, testified that DHMC acquired the material at issue from its attorney, no later than February of 2012. See Compl., Ex. H, Finn Dep. (doc. no. 3-8) 61:7-11. Because plaintiff alleges no contact between DHMC and the Board until after DHMC dismissed him, and also alleges that contact between DHMC and the Board was initiated by DHMC, he has not alleged that the Board, or any other arm of the State, ever insinuated itself into the process of DHMC's acquisition, dissemination or use of the documents at issue. In other words, he has failed to adequately allege joint action of a sort that would establish that DHMC engaged in any of the challenged conduct under color of state law.

Because plaintiff has failed to allege any conduct in which DHMC engaged under color of state law, DHMC is entitled to the dismissal of Count VI. Furthermore, because plaintiff himself treats DHMC and the Trustees as one and the same, DHMC's entitlement to dismissal of Count VI entitles the Trustees to the same relief. Accordingly, as to the Trustees, the court dismisses Count VI sua sponte.

The court is aware that "[s]ua sponte dismissals, which by definition are entered on the court's own initiative and without advance notice or an opportunity to be heard, are disfavored." Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Muni. of San Juan, 773 F.3d 1, 13 (1st Cir. 2014) (citing González-González v. United States, 257 F.3d 31, 36-37 (1st Cir. 2001); Berkovitz v.

App. 125

HBO, Inc., 89 F.3d 24, 31 (1st Cir. 1996)); see also
Garayalde-Rijos v. Muni. of Carolina, 747 F.3d 15, 22
(1st Cir. 2014) ("Sua sponte dismissals are strong med-
icine, and should be dispensed sparingly.") (quoting
Chute v. Walker, 281 F.3d 314, 319 (1st Cir. 2002)).
However, because plaintiff himself draws no distinc-
tion whatsoever between DHMC and the Trustees,
there is nothing in the FAC to support plaintiff's con-
tinued prosecution of Count VI against the Trustees.
Accordingly, sua sponte dismissal of Count VI as to the
Trustees is appropriate.

### B.  Count VII

In Count VII of his FAC, plaintiff claims that
DHMC is liable to him under 42 U.S.C. § 1985(c) for
conspiring to deprive him of equal protection under the
law. He frames his claim this way:

> As yet unknown individual agents of the
> Dartmouth Defendants, along with Penny
> Taylor, the other Board members, and Atty.
> Jeff Cahill conspired here for the purpose of
> preventing or hindering the Plaintiff's equal
> protection of the laws. It is apparent from the
> record that these two or more persons worked
> together to deprive Dr. Isaacs of his ADA
> rights, his State statutory rights, and Con-
> stitutional due process rights as described
> above. As well as violating his common law
> and contract rights, in furtherance of depriv-
> ing him due process, by crediting and publi-
> cizing a confidential document and ignoring
> the confidentiality of said documents, and the

App. 126

sanctity of the reasons for settling civil . . . disputes.

FAC ¶ 121.

DHMC argues that Count VII should be dismissed because plaintiff has failed to allege that the deprivation on which he bases his § 1985(3) claim resulted from invidious class-based discriminatory animus. Plaintiff responds by contending that he "has clearly set forth facts to show that the conspiracy of the Defendants was [based on] his position in a class of disabled individuals." Pl.'s Reply (doc. no. 26) ¶ 16. DHMC is entitled to the dismissal of Count VII.

"Section 1985 permits suits against those who conspire to deprive others 'of the equal protection of the laws, or of the equal privileges and immunities under the law. . . .'" Soto-Padró v. Pub. Bldgs. Auth., 675 F.3d 1, 4 (1st Cir. 2012) (quoting 42 U.S.C. § 1985(3)). As the court of appeals went on to explain:

> The elements of a section 1985 claim are . . . : (1) "a conspiracy," (2) "a conspiratorial purpose to deprive the plaintiff of the equal protection of the laws," (3) "an overt act in furtherance of the conspiracy," and, lastly, (4) either (a) an "injury to person or property" or (b) "a deprivation of a constitutionally protected right." Pérez-Sánchez v. Pub. Bldg. Auth., 531 F.3d 104, 107 (1st Cir. 2008). A section 1985 claim "requires 'some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action,'" id. (quoting

Griffin v. Breckenridge, 403 U.S. 88, 102 (1971)). . . .

Soto-Padró, 675 F.3d at 4 (parallel citations omitted).

In the section of his FAC devoted to his § 1985(3) claim, plaintiff makes no mention of any "class-based, invidiously discriminatory animus," Soto-Padró, 675 F.3d at 4. In his objection to DHMC's motion to dismiss, he attempts to remedy that deficiency by pointing to an allegation elsewhere in his FAC that "neither Dartmouth nor the Board of medicine want any disabled individuals to become Doctors," FAC ¶ 87, and his allegation, in paragraph 121, that DHMC conspired to deprive him of his ADA rights. However, the court of appeals for this circuit has held that § 1985 does not provide a remedy for ADA violations. See D.B. ex rel. Elizabeth B. v. Esposito, 675 F.3d 26, 44 (1st Cir. 2012); see also D'Amato v. Wisc. Gas Co., 760 F.2d 1474, 1485-87 (7th Cir. 1985) (holding that conspiracy based upon animus toward the disabled as a class is not actionable under § 1985(3)); Wilhelm v. Cont'l Title Co., 720 F.2d 1173, 1177 (10th Cir. 1983) ("We must conclude that class of 'handicapped persons' was not in the contemplation of Congress in 1871, and was not included as a class in what is now § 1985(3).") (citing Cain v. Archdiocese of Kan. City, Kan., 508 F. Supp. 1021 (D. Kan. 1981)). Because plaintiff has failed to allege any "class-based, invidiously discriminatory animus," Soto-Padró, 675 F.3d at 4, that is cognizable under § 1985(3), DHMC is entitled to dismissal of Count VII.

App. 128

Moreover, because the reasoning that applies to plaintiff's § 1985(3) claim against DHMC applies with equal force to his § 1985(3) claim against the Trustees, also asserted in Count VII, and to the § 1985(3) claim that plaintiff asserts in Count II, those two counts are dismissed in their entirety, as to all defendants, sua sponte. As the court has already noted, sua sponte dismissal is disfavored. See Watchtower, 773 F.3d at 13. But, because all of plaintiff's § 1985(3) claims rest solely upon his membership in a class of disabled individuals, and because discriminatory animus based upon disability does not give rise to liability under § 1985(3), see D.B., 675 F.3d at 44, "it is crystal clear that the plaintiff cannot prevail [on any of his § 1985(3) claims] and that amending the complaint would be futile," Garayalde-Rijos, 747 F.3d at 23 (quoting González-González, 257 F.3d at 37). In other words, the "allegations contained in [plaintiff's] complaint [with respect to his § 1985(3) claims], taken in the light most favorable to plaintiff, are patently meritless and beyond all hope of redemption." Id. (quoting Chute, 281 F.3d at 319). Accordingly, sua sponte dismissal of all of plaintiff's § 1985(3) claims is appropriate.

### C.  Count VIII

Count VIII is plaintiff's claim that DHMC retaliated against him, in violation of the Americans with Disabilities Act, for exercising rights he had under the ADA. Specifically, he claims that in retaliation for his having brought an ADA claim against it in his 2012 lawsuit, DHMC: (1) informed the Board that it had

App. 129

dismissed Dr. Isaacs from his residency; (2) provided the Board with court documents from Isaacs' action against USC; (3) convinced the Board to hold the February 5 hearing despite Dr. Isaacs' absence; and (4) failed to offer him the residencies he applied for in 2013, 2014, 2015, and 2016. According to plaintiff:

> Given his qualifications, and viewed in the light most favorable to the Plaintiff, the only plausible explanation for Dartmouth's failure to interview Dr. Isaacs is that they were retaliating against him for filing an ADA complaint against them.

FAC ¶ 146.

DHMC moves to dismiss Count VIII on several grounds, including Dr. Isaacs' failure to exhaust the administrative remedies available to him. In his reply to DHMC's motion to dismiss, plaintiff does not address the issue of exhaustion. In any event, Dr. Isaacs' failure to allege exhaustion is fatal to the claim he asserts in Count VIII.

With respect to exhaustion, the court of appeals has recently explained:

> Claims of employment discrimination and retaliation under the ADA are subject to the procedural requirements of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-5 to – 9. See 42 U.S.C. §§ 12117(a), 12203(c); Loubriel v. Fondo del Seguro del Estado, 694 F.3d 139, 142 (1st Cir. 2012). Under this procedural regime, litigation "is not a remedy of first resort" for either discrimination or

> retaliation cases. Jorge [v. Rumsfeld], 404 F.3d
> [556,] 564 [ (1st Cir. 2005) ] (internal quota-
> tion mark omitted). Rather, a would-be plain-
> tiff must first exhaust his administrative
> remedies. This task embodies "two key compo-
> nents: the timely filing of a charge with the
> EEOC and the receipt of a right-to-sue letter
> from the agency." Id.

Rivera-Díaz, 748 F.3d at 389-90 (emphasis added).
Here, plaintiff has not alleged that he filed a timely
charge with the EEOC or that he has received a right-
to-sue letter. Accordingly, DHMC is entitled to dismis-
sal of Count VIII.

Plaintiff's ADA retaliation claim, however, stands
on a slightly different footing than his § 1985(3) claims,
which are entirely irredeemable. With respect to the
ADA retaliation claim plaintiff asserts in Count VIII,
it is possible, if unlikely, that plaintiff: (1) has actually
exhausted it, but merely failed to so allege; (2) has a
valid reason for his failure to exhaust that would enti-
tle him to the benefit of equitable tolling, see Rivera-
Díaz, 748 F.3d at 390; or (3) still has time to exhaust
an ADA retaliation claim based upon DHMC's rejec-
tion of his 2016 application for a residency. Thus, it
would be premature to dismiss Count VIII with preju-
dice. By the same token, Count VIII also asserts an
ADA retaliation claim against the Trustees, and Count
IV asserts an ADA retaliation claim against the Board.
Obviously, a failure to exhaust would also entitle the
Trustees and the Board to dismissal of the ADA retal-
iation claims plaintiff asserts against them. Given that

App. 131

the facts necessary to determine whether plaintiff has exhausted his ADA retaliation claims are readily ascertainable, and in the interest of judicial economy, plaintiff is directed to show cause why his ADA retaliation claims against all defendants should not be dismissed for failure to exhaust.

D.   Count IX

Count IX is captioned "Injunctive Relief," and concludes in the following way:

> The Plaintiff is requesting an order requiring Dartmouth to train the Plaintiff as he has the skills and training necessary to complete the [DHMC residency] program and allowing him to complete the program is the only way to fully compensate him for the injuries that the Dartmouth Defendants have caused him.

FAC ¶ 154.

Count IX is somewhat unusual in that it requests a particular form of relief, but does not identify any cause of action that would entitle plaintiff to the relief he requests. According to DHMC, "Dr. Isaacs' claim for injunctive relief must . . . be dismissed because he is unlikely to succeed in the . . . claims [asserted] against DHMC [in Counts VI-VIII]." Def.'s Mem. of Law (doc. no. 22-1) 19. Plaintiff counters: "Plaintiff's complaint sets forth claims that are likely to succeed on the merits and therefore his Injunctive requests should stand." Pl.'s Reply (doc. no. 26) ¶ 24. In light of the parties'

App. 132

agreement that Count IX does not independently as-
sert a cause of action but merely identifies a form of
relief that may be available if plaintiff succeeds on one
or more of the claims he asserts in Counts VI-VIII,
Count IX is dismissed, as to both DHMC and the Trus-
tees, but without prejudice to plaintiff's right to seek
equitable relief for the ADA retaliation claims he as-
serts in Counts IV and VIII, should he be able to show
cause why those claims should not be dismissed.[5]

## IV.   Conclusion

For the reasons detailed above, DHMC's motion to
dismiss, document no. 22, is granted to the extent that
Counts VI, VII, and IX are dismissed as to DHMC. In
addition, acting sua sponte, the court dismisses Counts
VI, VII, and IX as to the Trustees and also dismisses
Count II. As a result, this case now consists of Counts
I, III-V, and VIII. Finally, plaintiff shall have twenty
days from the date of this order to show cause why
Counts IV and VIII should not be dismissed with prej-
udice for failure to exhaust.

---

[5] Most courts that have addressed the question, but not all,
have held that equitable relief is the only form of relief available
on an ADA retaliation claim. See Lavalle-Cervantes v. Int'l Hosp.
Assocs., S. en C. (SE), Civ. No. 14-1356 (BJM), 2016 WL 3264124,
at *2 (D.P.R. June 14, 2016) (citing Kramer v. Bank of Am. Sec.
LLC, 355 F.3d 961, 965 (7th Cir. 2004); Alvarado v. Cajun Oper-
ating Co., 588 F.3d 1261, 1270 (9th Cir. 2009); Bowles v. Carolina
Cargo, Inc., 100 Fed.Appx. 889, 890 (4th Cir. 2004); Collazo-
Rosado v. Univ. of P.R., 775 F. Supp. 2d 376, 388 (D.P.R. 2011)).

App. 133

SO ORDERED.

/s/ Landya McCafferty
    Landya McCarfferty
    United States District Judge

July 12, 2017

cc: Pierre A. Chabot, Esq.
    Keith A. Mathews, E#sq.
    William D. Pandolph, Esq.
    John F. Skinner, III, Esq.
    Seth Michael Zoracki, Esq.

───────────────────────────

App. 134

## United States Court of Appeals
## For the First Circuit

————————————

No. 18-1560

DR. JEFFREY ISAACS,

Plaintiff - Appellant,

v.

TRUSTEES OF DARTMOUTH COLLEGE;
NH BOARD OF MEDICINE; DARTMOUTH
HITCHCOCK MEDICAL CENTER,

Defendants - Appellees,

JEFFREY S. CAHILL; PENNY TAYLOR,

Defendants.

————————————

Before

Lynch, Stahl and Barron,
<u>Circuit Judges</u>.

————————————

## ORDER OF COURT

Entered: February 13, 2019

Treating Plaintiff-Appellant Jeffrey David Isaacs's motion to extend time to file a petition for rehearing as a motion to recall mandate, the motion is denied.

By the Court:

Maria R. Hamilton, Clerk

App. 135

cc:
John F. Skinner III, Mark L. Josephs, Pierre A. Chabot,
Elizabeth E. Ewing, Seth Michael Zoracki, William D.
Pandolph

———————————————————